## J. J. McCASKILL COMPANY *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 103. Argued January 25, 1910.—Decided February 28, 1910.

In this case it was held that the averments set forth in the bill of fraud and perjury in *ex parte* proceedings before the land office were sufficient to give a court of equity jurisdiction of a suit brought by the United States to cancel a patent.

In this case the testimony sustained the averments of the bill that the patent was obtained by fraud.

The rule that courts will not review decisions of the Land Department on questions of fact or reverse discretion properly exercised does not prevent the courts from setting aside a patent obtained by fraud upon the Department.

The presumption that a corporation is, in law, an entity distinct from its stockholders and officers cannot be carried so far as to enable the corporation to become a means of fraud; and knowledge of fraud on the part of the officers, who are also the principal stockholders and whose interests are identical, is properly to be imputed to the corporation itself.

In this case the testimony of an agent of the General Land Office as to conversations and admissions made by the entryman, with knowledge that he was a government officer seeking the facts as to the settlement of the land, was properly admitted, as was also the report made by such officer who testified as to the facts recited therein.

When testimony is admitted, but is not followed up by other testimony necessary to give it effect, this court will assume that the court below attributed to it no probative strength.

THE facts are stated in the opinion.

*Mr. W. W. Flournoy* for appellant.

*Mr. Assistant Attorney General Russell* for the United States.

MR. JUSTICE McKENNA delivered the opinion of the court.

This suit was brought by the United States to cancel a patent issued to one William Josiah Ward and a deed made by him and his wife to J. J. McCaskill & Company, and by the latter to the J. J. McCaskill Company, the appellant. The allegations of the bill are that the N. ½ of the N. E. ¼, S. W. ¼ of the N. E. ¼, and S. E. ¼ of N. W. ¼ of section 8, township 1 N., 17 W., in the county of Walton, State of Florida, being public lands of the United States, William Josiah Ward, on the eighteenth of September, 1900, filed his application upon them for a homestead in the land office in Gainesville, Fla. That he subsequently commuted the entry by paying the Government price therefor, making proof of settlement, cultivation and improvement for the period of time required by law, and that on January 13, 1903, a cash entry certificate No. 18,026 was issued to him and a patent on the third of June, 1903. It is alleged, with detail of circumstances, that the statement of Ward and the proof presented by him on the hearing for final proof were false, fraudulent and untrue. The allegations will be given later. The bill further alleges that the land embraced in the patent was conveyed by Ward to J. J. McCaskill & Company (the bill as originally filed alleged that the conveyance had been made to the McCaskill Company), a copartnership composed of J. J. McCaskill and E. L. McCaskill, then engaged in the manufacture of lumber at Freeport, Fla. That they afterward incorporated by the corporate name of the J. J. McCaskill Company, with the said J. J. McCaskill as president and Robert E. L. McCaskill as secretary, owning a large majority of the stock of the corporation, with the entire manage-

ment and control of its business and affairs. That the com-
pany took over from the said J. J. McCaskill or J. J. McCaskill
& Company the homestead entry of Ward, with full knowledge
of its president and secretary of the negotiations between the
company and the entryman by Warren Ward, an agent of
the company, "and with all the knowledge and notice of the
said McCaskill & Company of the fraud and duplicity prac-
ticed by William Josiah Ward in obtaining the patent from
the United States."

The answer of the company alleged that conveyance was
made by William Josiah Ward to J. J. McCaskill after the
patent was issued for the sum of four hundred and twenty-five
dollars; that McCaskill, for a valuable consideration, sold and
conveyed the same to the McCaskill Company; that the con-
veyance was made in good faith, without notice or knowledge
of any kind whatsoever of any irregularity or fraud upon the
part of Ward, if any there was, and that he was a *bona fide*
purchaser of the property; and that the company was a *bona
fide* purchaser, for a valuable consideration from J. J. McCas-
kill, and without knowledge or notice of any irregularity or
fraud practised by Ward. The usual replication was filed and
an examiner was appointed to take the proofs on the issues
made.

Upon report to the court a decree was entered overruling
the objections of the company to the evidence and the motion
to strike it out, and adjudged and decreed that the patent be
declared null and void, and that it be surrendered by the com-
pany, the decree finding it to be in its possession, to the clerk
of the court, to be inscribed by him "null and void." It was
further adjudged and decreed that the deed from William
Josiah Ward to J. J. McCaskill & Company and the deed from
the latter to the J. J. McCaskill Company be vacated and an-
nulled, and the company be enjoined forever from setting up
or claiming title to the land by reason of the patent or any of
the conveyances from Ward. The decree was affirmed by the
Circuit Court of Appeals.

There are twenty-three assignments of errors, eighteen of which are addressed to rulings on evidence and five attack, in general terms, the decree cancelling the patent and the conveyance by Ward. These five were alone discussed in the oral argument and in the brief on file under the following divisions:

"1. Are the averments of the bill of complaint sufficient to give the court of equity jurisdiction?

"2. Do the facts proved by the Government sustain the averment that the final proof of the entryman was false, fraudulent and untrue?

"3. Will this court review decisions by the land office officials upon questions of fact?

"4. Does the appellant occupy the position of an innocent purchaser and is the Government precluded because of his rights as such?"

1. To support the first proposition it is urged that the bill does not allege the facts upon which the charge of fraud in obtaining the patent was based and therefore "presents no issue for trial and should fail upon demurrer." But there was no demurrer filed to the bill. The only answer to paragraphs four and five (set out below) was that as to the facts of the former the company was not advised; that as to the facts of the latter it had "no knowledge," and denied, therefore, that they were true, and demanded strict proof of them. The first and only explicit objection to the bill for insufficiency is made in the brief filed in this court. But, conceding it covered by the assignments of error discussed by counsel and entertaining it, we think that it is without foundation. The following are its averments:

"Your orator shows unto your honor that the said William Josiah Ward, in the commutation proof taken on the 29th day of December, 1902, alleged himself, and made it appear by the testimony of others, that he had established a residence upon said land on March 10th, 1901, and that he continuously, resided thereon from that date until and up to the date of submission of final proof, except for absences on two or three

occasions of not exceeding three months, due to the illness of his wife; that he had improved the tract by erection of a house thereon and by cultivating one-half acre for two seasons, and the whole amount of improvements being alleged to be of the value of forty ($40.00) dollars, and that he had complied with the law entitling him to a patent to said lands.

"Your orator further shows unto the court that the statement of the said Ward and the proof presented by him on the hearing for final proof was false, fraudulent and untrue; that he did not have the improvements that he alleged that he had on said premises, and had not cultivated the said land; that the improvements accomplished on said entry consisted of nothing more than a pine-pole cabin, never completed, without floor, door or chimney; that there was absolutely no means of entrance or exit thereto or therefrom, unless through the unenclosed gable ends of said cabin; that the interstices between the poles of said cabin were never closed in any fashion; that the only ground on said entry which had undergone cultivation was a space within an enclosure of thirty by thirty-five feet; that the said Ward never resided upon said land, but during the period allowed for residence on the homestead entry, entryman actually resided at his home, where for a long time he had maintained his residence, three and one-half miles distant from said entry."

Appellant relies for its contention upon *United States* v. *Throckmorton*, 98 U. S. 61; *Vance* v. *Burbank*, 101 U. S. 514; *United States* v. *Maxwell Land Grant*, 121 U. S. 325, and other cases of like kind. We will not take the time to review them. It is enough to say that it was pointed out in *United States* v. *Minor*, 114 U. S. 233, that they do not apply to a case like that at bar, where the charge is that there was fraud and perjury in *ex parte* proceedings before the land office. See also *United States* v. *San Jacinto Tin Company*, 125 U. S. 273; *Moffat* v. *United States*, 112 U. S. 24; *United States* v. *Iron Silver Mining Company*, 128 U. S. 673; *Colorado Coal Company* v. *United States*, 123 U. S. 307; *United States* v. *Beebe*, 127

U. S. 338; *United States* v. *Budd,* 154 U. S. 15; *United States* v. *American Bell Company,* 167 U. S. 224.

2. This division involves the sufficiency of the evidence to sustain the decree. The argument at bar has not kept this division separate from the first or the first from it. They are manifestly different. The first concerns the sufficiency of the bill, this the sufficiency of the evidence. In other words, whether the evidence has established the averments of the bill, assuming them to be sufficiently specific, by clear and satisfactory proof. And it may be conceded that that is the degree of proof that the cases require. It was said in *United States* v. *Maxwell Land Grant, supra,* "that when a court of equity is asked to set aside a patent for fraud or mistake, the testimony on which this is done must be clear, unequivocal and convincing, and cannot be done upon a bare preponderance of evidence which leaves the issue in doubt."

Does the case at bar fill the measure of proof required by the cases? In this inquiry we start with the finding of the two lower courts in the affirmative. Appellant attacks the finding, but, as we have said, does not keep the discussion of this inquiry separate from the consideration of the sufficiency of the bill. In both stress is put upon the same proposition. It is contended that the allegations of the bill that the proofs submitted by Ward to the land office were fraudulent and untrue was a mere legal conclusion, and that besides it was solely the province of the land office officials to determine such matter, and "thus may, in their discretion, issue patents to persons upon evidence of improvement and cultivation of greater or less value and extent, the extent in value of the improvement being solely in their discretion." It is further argued that "the statutes governing the disposition of the public lands required neither a limited amount of improvement nor an absolute continuous residence," and "that when an entryman has clearly set forth the amount of the improvements, however small, and the department has issued a patent thereupon, then the question of the amount, or extent, is for-

ever put at rest." The purpose of the law, it is further argued, "is to give a part of the public domain to the poor man, and that therefore temporary abandonment, for the purpose of earning a livelihood or support his family, or to secure funds with which to make improvements, or on account of sickness, as in the case at bar, is permissible." The value and amount of improvement, it is finally urged, is immaterial except to detract from the good faith of the entryman, "and then only when accompanied with evidence of the ability of the entryman to make more improvements than in fact were made." These tests may be accepted, *arguendo*, and the fraud of Ward is established.

The averment of the bill is that he deceived the land office by false testimony of the extent of his improvements, cultivation and residence, and secured his patent by that deception. In other words, that the judgment and discretion of the land office were invoked, not upon the actual extent of his improvements, cultivation and residence, but upon a misrepresentation of their extent. See *United States* v. *Minor, supra*.

It may be well here to consider what the law requires. It gives the right of entry of 160 acres of land as a homestead, upon the condition, however, which must be established by affidavit, that the "application is honestly and in good faith made for the purpose of actual settlement and cultivation and not for the benefit of any other person." That applicant will honestly endeavor to comply with the requirements of settlement and cultivation, and does not apply to enter the same for the purpose of speculation. The purpose of the law, therefore, is to give a *home*, and to secure the gift the applicant must show that he has made the land a home. Five years of residence and cultivation for the term of five years he must show by two credible witnesses.

Residence and cultivation of the land are the price that is exacted for its payment. It is in the power of the settler to modify the terms somewhat. He may substitute for a residence and cultivation for five years a residence and cultiva-

tion for not less than fourteen months, but he must make "proof of settlement and of residence and cultivation for such period of fourteen months," and pay the price provided by law for the land entered. This is known as the "commutation" of his homestead entry.

In view of these provisions of law we may judge of what Ward did. He entered the land as a homestead, and on the eighth of September, 1900, filed the affidavit required, stating that he made his application honestly and in good faith, for the purpose of actual cultivation and settlement, and not for the benefit of any other person. On the twenty-ninth of December, 1902, he produced two witnesses to establish his residence, cultivation and character of his improvements, one of whom testified that he was well acquainted with Ward and the land embraced in Ward's claim; that it was "low piney woods land, very wet in rainy seasons." His testimony as to Ward's residence and cultivation of the land is best exhibited by the following questions and answers:

"Q. 5. When did claimant settle upon the homestead, and at what date did he establish actual residence thereon?

"A. About the 9th of March, 1901.

\*    \*    \*    \*    \*    \*    \*    \*

"Q. 6. Have claimant and family resided continuously on the homestead since first establishing residence thereon?

"A. I don't think they have continuously. I have seen them absent from it a time or two.

"Q. 7. For what period or periods has the settler been absent from the land since making settlement, and for what purpose; and, if temporarily absent, did claimant's family reside upon and cultivate the land during such absence?

"A. I have known of their being absent a time or two, but he has not been off of it over three months at the longest period. His wife is very feeble, and the land is so low and wet that, on account of her health as well as to make a support, he was compelled to be absent. I presume he has been on it nearly every week."

The other witness was even more definite. Answering a question as to the continuity of the residence of Ward and his family on the land, he said that he could not say "whether continuous or not, have not been there all the time, they were there every time I have been there, but on one or two occasions have seen them off the land." And further, as to the absence of Ward and his family, he said: "I don't know exactly how long, but am satisfied they have not been absent over six months at the longest for the purpose of making a support, and on account of the land being so low and wet and unfit for cultivation." Both witnesses gave the extent of cultivation to be one-half acre for two years and the improvement to consist of a house and garden of the value of forty or fifty dollars.

Ward himself testified that he established his residence on the tenth of March, 1901, and that his improvement consisted of a small dwelling house and a garden of about one-half acre of land, worth about forty dollars. He testified further as follows:

"Q. 5. Of whom does your family consist; and have you and your family resided continuously on the land since first establishing residence thereon?

"A. Myself and wife. No, not continuously; that is, not every day and night.

\*          \*          \*          \*          \*          \*          \*          \*

"Q. 6. For what period or periods have you been absent from the homestead since making settlement, and for what purpose; and, if temporarily absent, did your family reside upon and cultivate the land during such absence?

"A. Was absent two or three times, not over three months at longest period, on account of my wife's health. She is very feeble, and the land is so low and wet, that it was impossible to keep her on the place all the time."

And he further testified that he had not sold, conveyed or mortgaged any portion of the land. This testimony would have established, if true, that Ward with his family took up

his residence on the land on the tenth of March, 1901, that his improvement consisted of a small dwelling house, fit for habitation, and a garden of one-half acre, cultivated two seasons, and that after making his settlement he was absent only "two or three times, not over three months," at longest, "on account of his (witness') health." This was the testimony upon which the land department acted. What is the evidence in this case? His two sons never saw him on the land, but always saw him at his residence, four or five miles from the land. He testifies himself that he never moved his family there; that the house was built of pine poles, was twelve by fourteen in dimensions, had no floor, no chimney, no "ceiling or boards on between the poles or the interstices;" that he fenced and cultivated "a small piece, not larger then the house," and this was enclosed by rails and poles and planted two years. His residence upon the land is described in the following questions and answers:

"Q. Did you ever have your family there on any night? Ever spend any night with your family there?

"A. I stayed there at night myself. My wife did not go there. She was very sickly.

"Q. About how many nights in the week did you spend there?

"A. I do not think I stayed in the same week more than one night in the week."

And there is other testimony showing that the house was unfit for habitation. A special agent of the General Land Office inspected the place. He found, he said, "a little pole cabin, 11x13, not completed, and there was no door to go in and out of. There was no window, no chimney, the openings between the poles were not closed, the gable ends were not closed." He further testified that there was no evidence of any residence or habitation there at all. And further, "there was a little enclosure, 30x35 feet, a little amount that was about a quarter of a mile from the house." This witness also testified to the conversation with Ward, in which the latter told

him that he (Ward) had not lived on the homestead entry, and that he thought that he was going to lose it. We think that this testimony sustains the averments of the bill that the patent was obtained by fraud. This is not a case where the courts are undertaking to review the decisions of the land office officials on questions of fact nor to reverse their discretion properly exercised. It is a case of fraud upon them and obtaining a patent by means of that fraud.

Does appellant occupy the position of the innocent purchaser, and is the Government precluded from receiving the relief prayed for in the bill because of such fact? The answer to the question depends upon a proposition of law, and whether J. J. McCaskill had knowledge of the fraudulent acts of Ward. This knowledge was, in effect, found by both the lower courts, and, giving to their finding the strength that should be accorded to it, we pass to the consideration of the proposition of law that the knowledge of J. J. McCaskill, though president of the McCaskill Company, cannot be imputed to it because, as appellants' argument is, while the knowledge of an agent is the knowledge of the principal, an "exception to the rule is that if the agent is acting in a matter in which he has a personal interest, or in communication with which he is interested with a third person, the presumption is that he will not communicate the facts in controversy." And it is urged that "the rule should be more rigidly applied in cases of fraud or torts." For these propositions appellant cites *Clark* v. *Metropolitan Bank*, 3 Duer (N. Y.), 241; *Frenkel* v. *Hudson*, 82 Alabama, 162; *Allen* v. *South. P. R. R. Co.*, 150 Massachusetts, 200; *Innerarity* v. *Mer. Natl. Bank*, 139 Massachusetts, 332; *Atlantic National Bank* v. *Harris*, 118 Massachusetts, 147; *Loring* v. *Brodie*, 134 Massachusetts, 453; *Hightstown* v. *Christopher*, 40 N. J. L. 435.

Undoubtedly a corporation is, in law, a person or entity entirely distinct from its stockholders and officers. It may have interest distinct from theirs. Their interests, it may be conceived, may be adverse to its interest, and hence has arisen

against the presumption that their knowledge is its knowledge, the counter presumption that in transactions with it when their interest is adverse their knowledge will not be attributed to it.   But while this presumption should be enforced to protect the corporation it should not be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibilities.   A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it and to the officers who are identified with that purpose.   Illustrations are given of this in Cook on Corporations, §§ 663, 664 and 727.   The principle was enforced in this court'in *Simmons Creek Coal Company* v. *Doran*, 142 U. S. 417.   In that case a corporation claimed title to land through a deed of its corporators, one of whom became its president. Of the effect of this the court said: "Associated together to carry forward a common enterprise, the knowledge or actual notice of all these corporators, and the president was the knowledge or notice of the company, and if constructive notice bound them it bound the company."

The case at bar is within the principle. The bill alleges that J. J. McCaskill and Robert E. L. McCaskill were copartners and engaged in the manufacture of lumber at Freeport, Fla.   They incorporated this business, it is alleged, under the laws of Florida, "by the corporate name of J. J. McCaskill Company, with the said J. J. McCaskill as president and the said Robert E. L. McCaskill as secretary, owning a large majority of the stock of said corporation, with the entire management and control of the business and affairs of said corporation."   There is no denial of this allegation.   The interest of the corporators and the corporation thus shown to be identical, not adverse, we think the ruling in *Simmons Creek Coal Company* v. *Doran* is applicable.

This discussion disposes of the five assignments of error which were presented at the oral argument.   The other assignments of error are based on rulings upon the admission of evidence.

These assignments are grouped by counsel in two classes: (1) one to three being based upon the action of the trial court in admitting the testimony of Antonine Paul, which we have given; (2) four to eighteen attack the ruling of the court in admitting testimony of the purchase by the company of other homestead claims.

To support the contention that the court erred in its ruling admitting the testimony of Paul it is urged that no foundation had been laid for it by an indication of time, place and circumstances. The record shows that these conditions were satisfied. The witness' attention was drawn to the statement by him to Paul, and he himself testified that it was made at his dwelling house, and testified that he signed the statement.

It is clear, therefore, that the witness was given opportunity to explain. The circumstances and occasion of making the statement were drawn to his attention and the person to whom it was made. He knew that Paul was a Government agent, seeking the exact facts as to his, the witness', settlement upon the land. He could not have underrated the importance of the relation of the statement to his testimony and the necessity of a clear explanation of it.

The statement was made the basis of a report to the land office and was introduced in evidence over the objection of the company's counsel. This seems more to have been done for a connected statement of the facts than for proof of them. The facts were testified to by Paul. We cannot see that there was prejudicial error in the ruling of the court.

The assignments of error in the second class are also without merit. The purpose of the testimony of other transactions, counsel say, was "to show a systematic course of dealing by McCaskill, such as would support a contention that he had guilty knowledge of whatever fraud might exist in the procurement of the patent in litigation." It is admitted that the testimony was competent for such purpose, but it is contended it should have been accompanied by evidence showing that such other transactions were false and fraudulent, and this,

it is insisted, was not done.   If so, the testimony was harm-less.   In other words, if the testimony was not followed up by other testimony which was necessary to give it effect we may assume that the court below gave to it no value or proba-tive strength.   It must be kept in mind that the case was tried by the court.

*Decree affirmed.*