### RUEDY et al. v. TWIGG.

(Court of Appeals of District of Columbia. Submitted May 1, 1922. Decided June 5, 1922.)

No. 3722.

1. Brokers ⬳50—Brokers held entitled to commission on sale before agency terminated.

Where a contract for the sale of numerous tracts of land required the brokers to sell 100 acres by a stated date or the contract would be terminated, and prior to that date the brokers made a sale, approved by the owner and the contract entered into, they were entitled to commission on that sale, though they failed to make the number of sales required to continue the contract in force.

2. Brokers ⬳11—Owner cannot arbitrarily refuse written approval after orally agreeing to terms.

Where a contract employing brokers to sell land, provided that the contracts of sale should be subject to the owner's approval, the owner

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cannot arbitrarily refuse to give his written approval to a contract for the sale of land after orally stating, while the contract was being negotiated, that he was satisfied with its terms.

3. **Brokers** ⚬—11—**Owner is liable to brokers for damages for arbitrarily breach-ing contract before sale.**

An owner of a large tract of land, who made a contract with brokers for the sale of that land in parcels, is liable to the brokers for damages resulting from the owner's arbitrary breach of the contract before the brokers had made the sale.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Action by Jacob A. Ruedy and another against Gilbank Twigg to recover damages for breach of a broker's contract. Judgment for defendant on directed verdict, and plaintiffs appeal. Reversed and remanded for a new trial.

Joseph W. Bailey and R. H. Yeatman, both of Washington, D. C., for appellants.

C. A. Douglas, Conrad H. Syme, and Joseph V. Morgan, all of Washington, D. C., for appellee.

VAN ORSDEL, Associate Justice. Appellants, plaintiffs below, entered into a contract with defendant, Twigg, contracting under the name of Leeds Manor Orchards, Limited, on June 23, 1913, under which plaintiffs agreed to sell approximately 3,000 acres of land owned by defendant in Virginia. Six hundred acres of the land was then planted in apple trees, and the remainder of the tract was unplanted. It was the policy of the defendant to sell the land in small tracts planted to apple trees.

Plaintiffs were given the exclusive right of sale, and it was agreed, among other things, that the first 50 acres should be sold at not less than $300 per acre, out of which the plaintiffs were to be paid a commission of 25 per cent. out of the first moneys received on each of said sales. When 50 acres were sold the price of the land could be increased by defendant, and when the price was increased so as to net defendant $300 per acre, then the commissions paid plaintiffs were to be increased proportionately, but not to exceed, on any sales, the amount of 33⅓ per centum. It further provided that, when all the land then planted had been sold, defendant agreed to plant such of the remaining 2,400 acres, more or less, as was practicable, in apple trees, thereby furnishing to plaintiffs additional planted acreage to sell, or to allow them to sell land subject to planting and guaranteed care for five years.

The title to the property was placed in trust with the Continental Trust Company of Washington, which was to execute deeds for land sold under the agreement. After making the contract, plaintiffs made preparation for the placing of the land upon the market, and had literature and contracts of sale printed. In pursuance of their employment they sold 35 acres to one Johnson, 25 acres to one St. Julian Marshall, 10 acres to one Mallory, 20 acres to one R. C. Marshall, and 10 acres to one A. S. Carter, all of which sales were made prior to the 1st

day of January, 1914. The contracts of sale provided for approval thereof by defendant.

It is alleged that plaintiffs were embarrassed in the sale of the lands by the failure and arbitrary refusal of the defendant to accept the contracts submitted to him by the plaintiffs, though plaintiffs—

"were always, during the time which this contract was in force and effect, ready, able, and willing to perform all of their obligations of any nature whatsoever under it"; but the "defendant has failed and refused to perform his obligations under the said contract, and on or about the 3d day of January, 1914, the defendant notified the plaintiffs that his contract with them was at an end, because of their failure to sell sufficient acreage to make their contract with him a continuing one." ·

As a result of which plaintiffs claimed damages in the sum of $150,-000. Defendant answered, denying liability, and at the termination of the taking of the evidence, the court on motion directed the jury to return a verdict in favor of defendant. From the judgment thereon, plaintiffs appealed.

The sole question presented is whether or not the court erred in taking the case from the jury. It is conceded that the Johnson contract was duly approved by defendant and delivered to the trust company. The contract with Johnson provided for a cash payment of $2,-625. This payment was accepted in the form of a promissory note, for which Johnson subsequently sent his check to the trust company. There was further testimony by one of the plaintiffs that Twigg verbally approved of the making of the contract with St. Julian Marshall; that the terms and conditions of said contract were satisfactory to Twigg. After the contract was made and completed, and turned over to the Continental Trust Company, Twigg refused to indorse his approval thereon.

Considerable correspondence appears in the record, showing that in the latter part of October, 1913. Twigg began to devise ways of avoiding his contract. In a letter dated October 27th, he expressed disappointment at the results attained in the sale of the property and stated that the existing contract—

"is so crude and indefinite that I cannot bring about the results I desire, namely, to sell at least 1,000 to 1,500 acres by the end of 1914."

It will be observed that the contract had only been in operation a short time, and 14 months remained for operations between the writing of this letter and the end of 1914. Considerable correspondence followed, which did not result in the changing of the contract. It was testified by the plaintiff Jacob Ruedy:

"That he never, in the course of his dealing with this matter, attempted to fix the price without consulting Mr. Twigg. As a matter of fact, in his conversation and discussions with Mr. Twigg about the price, it was understood that no permanent fixed price should be made, as the price might be one thing one month, and as the property was developed and sales made it might be another thing. In the particular cases under consideration, where he made sales beyond the 50 acres, the prices of $350 for which these contracts called were discussed with Mr. Twigg and approved by him. Mr. Twigg agreed to the price of $350 that was made in the Mallory land."

[1] Unquestionably plaintiffs upon the face of the record are entitled to commission upon the sale of the Johnson land, since the sale contract was accepted by defendant. It was due to defendant's action and the action of the trust company that Johnson was permitted, after having sent a check for the cash payment which was held over a month by the trust company, to forfeit his contract. As soon as the contract was accepted by defendant, plaintiffs' right to a commission attached. While the contract required them to sell 100 acres before January 1, 1914, the failure to sell that amount, if such failure had occurred, would not have forfeited their right to a commission upon the amount sold. That condition in the contract merely authorized the discontinuance of the contract at that time.

[2] It appears, however, that more than 100 acres were sold prior to January 1, 1914, and there is evidence, as above quoted, that the terms of all the contracts of sale were approved verbally by defendant. He was not in position to arbitrarily refuse to attach a written approval, if before sale was made he had agreed to the terms of the sale, and a sale had been consummated on those terms.

[3] It also follows that, if defendant arbitrarily breached this contract, he would be liable in damages. These, however, are all issues of fact to be determined by the jury, and it was error to refuse to submit them to the jury for its determination.

The judgment, therefore, is reversed, with costs, and the cause is remanded for a new trial.

SMYTH, Chief Justice. I dissent, and briefly state my reasons for doing so:

(1) The action is upon a contract made by the Leeds Manor Orchards, Limited, a corporation, party of the first part, and the appellants, parties of the second part. Twigg is not a party to it, yet the action is against him. It is alleged that he, with the consent of the plaintiffs, adopted the contract as his personal undertaking. This is denied by him, and there is not a line or a word in the testimony which supports the allegation. On the contrary, he made it clear in his letter of November 5, 1913, that the contract was with the corporation, and not with him, and, when he approved the Johnson contract, he did it in the name of the corporation. There is no suggestion anywhere that this case falls within the principle that, where the stockholders or officers of a corporation are seeking to use the corporation as a means to screen illegal acts by them, the corporate entity rule may be ignored, and the wrongdoers treated as if no corporation existed. McCaskill Co. v. United States, 216 U. S. 504;[1] Linn & Lane Timber Co. v. United States, 236 U. S. 574, 35 Sup. Ct. 440, 59 L. Ed. 725; State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541. There is no theory, then, upon which Twigg can be held upon a contract that he never made.

(2) It is said that the appellants are undoubtedly entitled to commission on the sale to the Johnsons (there were two). By the contract sued on the corporation was authorized to fix the terms of payments for the

[1] 30 Sup. Ct. 386, 54 L. Ed. 590.

land, and it agreed to pay to the appellants "a commission of 25 per centum, said commission to be paid out of the first moneys received by the said party of the first part [the corporation] on each of said sales." The Johnson contract recited that with it they handed to Twigg "the first payment of $2,625, payable to the Continental Trust Company of Washington, D. C.," etc. The contract was delivered to the trust company, but it was not accompanied by the money. Afterwards the Johnsons sent a check payable to the trust company for the amount of the first payment, but later stopped payment on it. Just why they stopped the payment is not explained in the record. It appears, then, that no money was received on the contract by the corporation, or by Twigg, and hence that the appellants are not entitled to recover any commission, for, as we have just seen, the commission was to be paid out of the first money received by the corporation on the contract. This accords with appellants' construction of the contract, if that be material, for one of them testified that he never made any·demand for the payment of the commission after he knew the Johnsons had stopped payment on the check. According to the record, "he knew that the payment of the check had been stopped, and never asked Mr. Twigg to pay his commission on that sale." He repeats this statement several times. It indicates ·that he regarded the Johnson sale as never having been consummated, because Johnson did not make the first cash payment required by the terms of the contract, and therefore that he was not entitled to any commission on account of it. But, whatever he thought about the matter, he has no right to the commission.

(3) With respect to the other contracts I do not think there is any evidence that the corporation or Twigg acted arbitrarily in refusing to approve them. If the terms and conditions were not satisfactory, the corporation had a right to reject the contracts, and the mere fact that it did so, and there is no more, fails utterly to prove that the rejection was made in bad faith. We have said that where a party assumes the obligation of furnishing a machine that would be satisfactory to the purchaser he must do so or fail to effect a sale. In such a case, Mr. Justice Van Orsdel, speaking for the court, said, nothing was "to be left to the judgment of a third party, hence, nothing for the jury to determine." "We are not concerned," said the Justice, "with the wisdom or the folly of the plaintiff in making such a contract." Rondinella v. Southern Railway Co., 33 App. D. C. 65, 79. See, also, Bayer Steam Soot Blower Co. v. Cornell Co., 47 App. D. C. 146. There is no difference in principle between the obligation to furnish a satisfactory machine and the obligation to furnish a satisfactory contract.

(4) The contract between the corporation and the appellants provided that it should not.be in force after January 1, 1914, unless the appellants had sold in the meantime 100 acres of the land on terms and conditions satisfactory to the corporation. By eliminating the 35 acres which the Johnson contract called for, and giving the appellants credit for all the other sales which they claim to have made, they disposed of less than 65 acres within the time limited, and hence the contract ceased by its own terms on January 1, 1914. This being so, the

appellants cannot maintain an action for damages because not permitted to make sales after that date.

Believing the lower court was right, I think its judgment should be affirmed.