EXCHANGE NAT. BANK OF SPOKANE et al. v. MEIKLE.*

No. 6571.

Circuit Court of Appeals, Ninth Circuit.

Sept. 14, 1932.

WILBUR, Circuit Judge, dissenting.

*Rehearing denied November 28, 1932.

Hamblen & Gilbert and Post, Russell, Davis & Paine, all of Spokane, Wash., for appellants.

Sidney Teiser and Teiser & Keller, all of Portland, Or., for appellee. .

Before WILBUR and SAWTELLE, Circuit Judges, and McCORMICK, District Judge.

SAWTELLE, Circuit Judge.

This appeal comes from a suit in equity brought in the United States District Court of the Eastern District of Washington, by J. D. Meikle, a citizen of Oregon, trustee in bankruptcy of the Fred Herrick Lumber Company, an Oregon corporation, against the Exchange National Bank of Spokane, Wash., and J. A. Drain, receiver of said bank, both citizens of Washington, for recovery of $49,446.56, with interest, alleged to be due the bankrupt lumber company from the bank.

Fred Herrick for many years had extensive holdings in the lumber business in the south and in the northwest, and owned all but the qualifying shares of stock in the Milwaukee Lumber Company, the Coeur d'Alene Mill Company, and the Export Lumber Company, all Idaho corporations; also, 50 per cent. of the stock of the Scotch Lumber Company.

In 1923 Herrick organized the Fred Herrick Lumber Company, an Oregon corporation with its principal office in Burns, Or., to open up valuable timber holdings. Of this company he was president and owned all the stock except about 102 shares. The capital stock of the company was $500,000, and Herrick furnished the money and subscribed for the original stock issue. The company began the construction of a lumber mill and railroad in connection therewith, and as the size of the undertaking grew more money was needed. The capital stock was increased from $500,000 to $2,000,000, the money for which came chiefly from other companies owned by Herrick personally. In this connection Mr. Herrick said: "The capital stock was increased from $500,000 to two million dollars because I had put in more money than the $500,000. The arrangement from the inception was that I was to take stock for the money I put into the concern and that continued until the company was finally sold."

This testimony was corroborated by that of J. W. Girard, vice president and general manager of the Fred Herrick Lumber Company. However, there was no formal agreement to that effect entered into between the corporation and Herrick, and only share certificates in blank were actually issued to Herrick.

The Herrick Lumber Company received money from both the Export Company and the Milwaukee Company, but the greater amount from the latter. During the period of time in question the advances from the Milwaukee Company to the Herrick Company amounted to $506,445.02, which were handled in the following manner: Mr. Herrick used the Milwaukee Company much as he would have used a bank, and had therein an account called "The Fred Herrick Advance Account." On the credit side of this account went such items as Mr. Herrick's monthly salary, payments to Mr. Herrick from the Export Lumber Company, the Coeur d'Alene Mill Company, the Scotch Lumber Company, proceeds from the sale of the Interior Lumber Company; in short, any money received by Mr. Herrick from his many and various enterprises. On the debit side appeared the items for Mr. Herrick's ordinary living expenses, his food and clothing and telephone bills, his investments. The account was carried by the Milwaukee Lumber Company in much the same manner as a bank would have carried it. Mr. Herrick also had a personal bank account at a bank in St. Maries, but any overdrafts were taken care of by checks from the Milwaukee Company, which checks were debited to the "Fred Herrick Advance Account." During the period from May 14, 1923, to October 30, 1928, which covers the time when the advances were being made to the Fred Herrick Lumber Company, there was deposited in the "Fred Herrick Advance Account" of the Milwaukee Company the sum of $2,953,725.50, and the amount of disbursements during the same period was $2,217,216.44, showing a credit balance of over $736,000.

All the money received from Mr. Herrick was also kept in a "Fred Herrick Advance Account" on the books of the Fred Herrick Lumber Company. Of the moneys obtained from the Milwaukee Company some $109,000 was evidenced by checks drawn by the Milwaukee Lumber Company to the order of the Fred Herrick Lumber Company, and $318,622.50 was obtained from the Milwaukee Company in the following manner: Fred Herrick gave his individual check to the Fred Herrick Lumber Company drawn on the First National Bank of St. Maries, Idaho. Generally these checks were issued in blank, the amount not being filled in, and they were left with Mr. Girard to be filled out and deposited when needed. They were filled out

by Mr. Girard from time to time and deposited with the Fred Herrick Lumber Company in its bank at Burns, and by that bank sent for clearance or collection to the First National Bank at St. Maries. Generally there would not be sufficient funds in the latter bank to honor the same and the bank would call upon the Milwaukee Company to make these checks good, and the Milwaukee Company would cover such checks by depositing forthwith almost identical sums.

Money was obtained from the Export Lumber Company as follows: the Export Lumber Company borrowed $100,000 from the First National Bank of Portland for which it gave its note. The $100,000 thus obtained was transmitted at the request of the Export Lumber Company to the Exchange National Bank of Spokane. This latter bank thereupon at the request of the Export Lumber Company distributed for the account and on behalf of the Fred Herrick Lumber Company out of said moneys the sum of $50,000 by transmitting the same to the First National Bank at Burns, Or., for deposit to the credit of the account of the Fred Herrick Lumber Company, which $50,000 was so deposited; $10,066.67 was transmitted to the Washington National Bank of Ellensburg for the purpose of taking up two notes of the Fred Herrick Lumber Company held by that bank, and said two notes were so paid.

These advances by the Milwaukee Lumber Company and by the Export Company to the Herrick Company constituted the consideration for claims filed and allowed in the bankruptcy proceedings.

The Milwaukee Company never paid a dividend on its stock nor was there any corporate authorization for the withdrawals of money from that company by or on behalf of Fred Herrick.

In September, 1928, Fred Herrick and two officers and directors of the Fred Herrick Lumber Company reached an agreement with the Edward Hines Western Pine Company whereby the latter agreed to purchase practically all the assets of the former for $750,000. On October 4th the sale was consummated and the assets transferred to the Hines Company. At the time of the transfer the Fred Herrick Company gave an order to the Hines Company to pay, from the $750,-000, certain specified sums to enumerated creditors of the Herrick Company. The sums owed aggregated the full amount of the purchase price and none of it was turned over to the Herrick Company except $10,264.02

for distribution in satisfaction of local current bills. On the list of creditors among others was that of appellant here in the sum of $49,446.56.

At the time the payment to the Exchange National Bank was made, Fabian B. Dodds, representing Fred Herrick's personal creditors to whom Herrick had assigned his shares of stock in the Fred Herrick Lumber Company, protested by word of mouth and by letter that, if this money was accepted by the bank, it would be a preference and that he would attempt to recover same on behalf of creditors.

The Fred Herrick Lumber Company was adjudicated bankrupt upon a voluntary petition on January 15, 1929, by the District Court of the United States for the District of Oregon, and thereafter J. D. Meikle, appellee herein, was elected trustee and duly qualified.

On August 5, 1929, a suit was instituted against the Exchange National Bank of Spokane and James A. Drain, receiver thereof, to recover from said bank the payment of $49,446.56 as an unlawful preference, and, on May 20, 1931, after trial, a decree was entered in favor of the trustee and against the Exchange National Bank, setting aside said preferential payment and giving judgment for the amount prayed in said complaint with interest from the date of filing said suit.

Petition for appeal was not filed until July 27, 1931, more than thirty but less than ninety days after the entry of the decree, and the order granting the appeal was not made until July 30, 1931.

■ Appellee has filed a motion in this court to dismiss the appeal herein because the appeal was not filed within thirty days after the entry of the decree as provided for in section 24c of the Bankruptcy Act, as amended (11 USCA § 47(c). We think this section inapplicable in a plenary suit like the one before us.

The same question, namely, the time within which an appeal must be taken in cases of this character, has recently been considered by the Second Circuit Court of Appeals in the case of Lowenstein v. Reikes et al., 54 F.(2d) 481, certiorari denied February 23, 1932, 285 U. S. 539, 52 S. Ct. 311, 76 L. Ed. 932. With the conclusion therein reached we are in full accord.

The motion to dismiss is denied.

■ The record shows that the testimony was all taken in open court. As this court has

previously said in two cases: "On the foregoing facts, the appellant is confronted by two well-established principles of law, from which there is little or no dissent: First, the findings of the chancellor, based on testimony taken in open court, are presumptively correct and will not be disturbed on appeal, save for obvious error of law or serious mistake of fact. * * *" Easton v. Brant (C. C. A.) 19 F.(2d) 857, 859; Gila Water Company v. International Finance Corporation (C. C. A.) 13 F.(2d) 1, 2.

We are concerned, therefore, chiefly with the conclusions of law, the correctness of which may be determined, as appellant concedes, by the answer to one question, namely: Was the Herrick Lumber Company solvent or insolvent on October 9, 1928, the date on which the payment of $49,446.56 was made to the Exchange National Bank of Spokane? If the company was solvent, the payment to the bank was valid; if the company was insolvent, then the payment to the bank constituted a preference against creditors within the meaning of the Bankruptcy Act (11 USCA) and is voidable.

A careful study of the assets and liabilities of the Fred Herrick Lumber Company on October 9, 1928, as tabulated in the briefs, shows that the solvency or insolvency of the company on that date must be determined by the construction placed upon the "Fred Herrick Advance Account." If that account, in the sum of $506,445.02, was evidence of the liability of the Fred Herrick Lumber Company to the Milwaukee Company for that amount, then the Fred Herrick Lumber Company was insolvent on October 9th.

The manner in which the officers of Mr. Herrick's various companies regarded the "Fred Herrick Advance Account" must be considered. It will be remembered that Herrick was the sole owner, except for a few shares of qualifying stock, of several large companies. In connection with his method of doing business, Mr. Herrick said:

"The Milwaukee Lumber Company was the resident company and all transactions went thru the Milwaukee Company. For instance, the proceeds of the sale of the Interior Lumber Company went thru the Milwaukee Company. The reason for putting the money in in that way was that Mr. Palmer did the collecting for me in these accounts and the money came in there if I wanted it paid out to any individual company he paid it out. The money that went in was my money and I was given credit for it in my personal account and as it was spent I had Mr. Palmer issue checks for it and it was charged to me. During those years there were many hundreds of thousands of dollars handled that way, and during the latter part of the term I was sole owner of all of the stock of the Milwaukee Lumber Company and the other companies except the qualifying shares. * * *

"I only took out of these companies what was mine. It kept coming in from every direction. If a dividend came from the Alabama property, it went into the Milwaukee office; if a dividend came in from the Interior Company, it went there. * * * The Milwaukee Lumber Company was acting as distributing agent from its inception even tho the Scotch Lumber Company owned fifty per cent of the stock. * * *"

Mr. J. W. Girard, vice president and general manager of the Fred Herrick Lumber Company, said: "Mr. Herrick was practically the whole Fred Herrick Lumber Company. The financing rested largely on him and when the company needed money we looked to him to furnish it. * * * The Fred Herrick advance account showed all the money we had received from Fred Herrick. I assumed that it was all coming from Fred Herrick or as a result of his activity or his interest, but whether or not it was all received direct from Mr. Herrick as an individual I could not tell. * * *"

The manner in which Herrick's business enterprises were carried on shows a complete disregard of corporate organization and identity, not only with regard to corporations chartered in the same state but also with regard to corporations chartered in different states. It is not difficult to see Herrick as the prime mover of all the various companies, but the rule is well established that a corporation exists as an entity, and that courts of law will not go beyond the fact of corporate existence in order to examine the real ownership of a corporation. The New York Court of Appeals has laid down the general rule as follows:

"In no legal sense can the business of a corporation be said to be that of its individual stockholders. It is true that they have an interest in the business carried on, and an influence in controlling its conduct; but they have created a legal entity to prosecute such business, make its contracts, and be responsible for its obligations, and that entity is alone responsible to persons dealing with it for the conduct of such business." People v. American Bell Telephone Company, 117 N. Y. 241, 255, 22 N. E. 1057, 1062. Quoted in

Cook on Corporations (Eighth Ed.) vol. III, §§ 663, 664, p. 2566. See, also, Eisner v. Macomber, 252 U. S. 189, 214, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; Rhode Island Hospital Trust Co. v. Doughton, 270 U. S. 69, 82, 46 S. Ct. 256, 70 L. Ed. 475, 43 A. L. R. 1374; Flink v. Paladini, 279 U. S. 59, 63, 49 S. Ct. 255, 73 L. Ed. 613.

Moreover, this general rule is observed even when all or practically all of the stock is owned, as here, by one person.

"A corporation can not act except through its proper agents and in the prescribed way, and in the operation of the principle it makes no difference that the stockholder owns all or practically all the stock of the corporation and controls it, still the property of the corporation does not belong to him, but to the corporation." [Numerous cases cited.] Thompson on Corporations, vol. 6, § 4475, p. 350.

Again, "even when all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons." Green v. Victor Talking Machine Co. (C. C. A. 2) 24 F.(2d) 378, 59 A. L. R. 1091.

The case of Elenkrieg v. Siebrecht, 238 N. Y. 254, 144 N. E. 519, 521, 34 A. L. R. 592, presents a particularly close analogy. There the court said: "Merely because Siebrecht referred to the property as his property cannot overcome the undisputed fact of the corporation's existence and ownership. His family owned all the stock of the corporation, and it is a fact that the corporation was a family affair. * * * However this may be, the corporation exists; it has title to the property; it maintains and operates the property through agents. The fact that it is a family corporation, so to speak, is nothing suspicious or illegal. Innumerable are the corporations wherein all the stock is owned by a few members of one family. The fact that one man may own all but a few shares of the stock, and be in fact the dominant and controlling factor or the only active manager of the corporation, is no evidence in and of itself that the corporation does not exist as a person in the eyes of the law actually owning, operating, and controlling property."

We are not unmindful of a long line of cases in which the courts, particularly courts of equity, have looked behind the technical fact of corporate organization to hold that the individual shareholders are the real persons in interest. See, for example, In re Rieger, Kapner & Altmark (D. C.) 157 F. 609; Minifie v. Rowley, 187 Cal. 481, 202 P. 673, 676; United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 F. 247; McCaskill Co. v. United States, 216 U. S. 504, 514, 515, 30 S. Ct. 386, 54 L. Ed. 590. Minifie v. Rowley, supra, holds that the courts will disregard corporate identity when failure to do so would "sanction a fraud or promote injustice"; we are not convinced that the facts of the instant case meet either of the criteria.

■ We must give due weight to the uncontradicted testimony of Mr. Herrick that at all times he considered the "Fred Herrick Advance Account" on the books of the Milwaukee Company in the nature of a bank account, and that he felt at all times that any sums he put therein were his money. But the question of title to those funds is one of law and not of personal opinion. After the Milwaukee Company received money from Mr. Herrick or from any of his companies, the title thereto was in the corporation and not in Herrick personally. The transfer of large sums by the Milwaukee Company to the Fred Herrick Lumber Company without repayment was not an authorized corporate act, and consequently, in the absence of any showing that the sums were for materials or for value received in any form, created a liability of the Fred Herrick Lumber Company to the Milwaukee Company. The fact that Fred Herrick personally, owning all or substantially all the stock of the Milwaukee Company, authorized the transfers in a personal capacity through a mistaken conception of his own rights does not alter the situation.

■ Corporations exist as legal persons and the courts uphold them in the exercise of their independent rights, as distinguished from the rights of the individual stockholders. It would be the greatest inconsistency to allow an individual to set up any number of corporations, to recognize the corporate existence when it might be to his interests to do so, and to disregard entirely such organization and ignore completely the corporate fiction whenever he chose. If the position contended for by appellant here were upheld, the result would be only confusion in the credit of all corporations and a growing feeling of distrust of all joint stock companies.

Appellant states that the Exchange National Bank was misled by the books of the Fred Herrick Lumber Company and would not have loaned the money here involved if it had known that the "Fred Herrick Ad-

vance Account" represented a liability of the company. That may be so, but as the title to the money remained in the Milwaukee Lumber Company, and was not transferred by any corporate act, it is the creditors of the lumber company who must first be considered. The record gives us no facts concerning the creditors of the Milwaukee Lumber Company, but if there be any it is not right to destroy capriciously whatever assets they may have considered security for their money and to leave them completely unprotected. The "Fred Herrick Advance Account" was adopted as a bookkeeper expedient by each of the companies considered; we cannot hold that the creditors of the Milwaukee Company will have their legal status determined solely by whatever bookkeeping methods that company chose to adopt. Such a holding would mean that the rights of creditors could be disregarded in any corporations in which one person owned a majority of the stock of each.

An individual who is allowed to incorporate a joint stock company is given many advantages that he would not enjoy if he owned the business personally without the guise of corporate organization; it is not too much to ask that such a person, in return for the rights that he has been granted, be required to respect the organization that he has created and to allow it to function through legally recognizable corporate acts.

We do not pass on the proposition as to whether any advances received by the Herrick Company directly from Fred Herrick, or the money which the Herrick Company received from checks signed in blank by Herrick on his personal account, which usually constituted overdrafts that were met by the Milwaukee Company, created a stock transaction and not a loan in the light of all the facts of the case. As the advances came not from Fred Herrick personally, but from the Milwaukee Company, we are constrained to hold that they created a liability of the Fred Herrick Lumber Company to the Milwaukee Lumber Company. That being so, the total sum of $506,445.02 of the "Fred Herrick Advance Account" on the books of the Fred Herrick Lumber Company was a liability on October 9, 1928, and it clearly follows that the Fred Herrick Lumber Company was insolvent on that date. The payment to the bank, therefore, constituted a preference over creditors.

We find no error in the record, and the judgment of the lower court must be affirmed.

Affirmed.

WILBUR, Circuit Judge (dissenting).

It is a familiar doctrine of equity that, where all the stock of a corporation is owned by an individual, equity will look through the corporate form to the actuality and hold the corporation to be merely the alter ego of the stockholder.

This is a suit in equity involving the affairs of a number of corporations in which Fred Herrick was sole owner of the capital stock. He handled the affairs of these corporations very much as though they were his own, no shares of stock being outstanding except qualifying shares. Each corporation, however, had large interests and conducted large operations and maintained a system of books of account which purported to show the affairs of the corporation. Money was borrowed by these corporations from banks upon their credit. Among these corporations was the Milwaukee Lumber Company, located at St. Maries, Idaho; the Coeur d'Alene Mill Company, an Idaho corporation located at Coeur d'Alene; the Export Lumber Company, an Idaho corporation located at Harrison, Idaho; the Tuscor Lumber Company, the Red Collar Steamship line of Coeur d'Alene Lake. He was also the owner of 50 per cent. of the stock of the Scotch Lumber Company in Alabama, and also the Interior Lumber Company in Mississippi.

The question involved in this case, according to the appellant, is whether or not the Fred Herrick Lumber Company (hereinafter called the Herrick Company), was insolvent at the time of the alleged preferential payment of $49,446.56 to the Exchange National Bank of Spokane. This depends upon the validity of the claim of the Milwaukee Lumber Company (hereinafter called the Milwaukee Company) for $500,000 against the Herrick Company. Fred Herrick owned all the stock of both companies. According to appellee, while the primary question is the alleged indebtedness to the Milwaukee Company of over $500,000, there is also the question of whether or not the Herrick Company was insolvent by reason of indebtedness owing to the Export Company, amounting to $60,000, and Fred Herrick personally, in the sum of $90,000, the contention of the appellee being that notwithstanding the fact that the court may hold that there is no obligation owing from the Herrick Company to the Milwaukee Company nevertheless the indebtedness to Fred Herrick personally and to the Export Company is clearly established, amounting in all to about $131,000. In other words, abandoning the corporation cloak

worn by Fred Herrick in the business of the Milwaukee Company, of the Export Company, and of the Herrick Company, the question resolves itself into this: Was Fred Herrick insolvent because of the money he owed himself? This question involves an obvious absurdity. The complications in this case arise in large measure because of the fact that after a lumber mill costing over $2,000,000 had been erected by Mr. Herrick in his capacity as the Fred Herrick Lumber Company, the timber which was expected to be used by the mill was withdrawn from use by the Secretary of Agriculture. Consequently, Mr. Herrick arranged to sell the mill and all the property owned by the Herrick Company for $750,000 and to disburse that property to the creditors of the Herrick Company. In connection with the transfer of the mill to the purchasers a statement of the indebtedness of the Herrick Company was furnished them and it was arranged that the purchase money was to be paid directly to these creditors. It was the obvious intention of both Mr. Herrick and the purchaser that the affairs of the Herrick Company should be completely liquidated and all its debts paid in this manner. After the transfer, however, Mr. Herrick, finding himself in financial difficulties, made a common-law assignment to the Spokane Merchants' Association of all his stock in the Herrick Company, the Milwaukee Company, and in the Export Lumber Company. Thus the Spokane Merchants' Association obtained control of all the personal assets of Fred Herrick, and all the assets of the corporations in which he owned all the stock. In short, they stepped into his shoes and thus became clothed with his rights and obligations in the corporations in which he owned all the capital stock. In pursuance of this new ownership the Spokane Merchants' Association caused a petition in bankruptcy to be filed by the Herrick Company and Mr. Meikle to be elected trustee in bankruptcy thereof. He also became treasurer of the Milwaukee Company.

Mr. Meikle, the trustee in bankruptcy, in his capacity as common-law assignee, also as trustee in the voluntary bankruptcy of the Herrick Company, and also as sole stockholder in the Milwaukee and Export Companies, having control thereof by reason of the assignment of stock to him, is thus standing in the shoes of Fred Herrick. Still assuming, for the purpose of discussion, that the Milwaukee Company, the Export Company, and the Herrick Company, the only ones involved in this litigation, are in fact nothing more nor less than Fred Herrick personally, complications in the case arise from the fact that, by erecting these corporate entities, the defendant has become bound in his relation with others to the consequences naturally flowing from such corporate organization, so that the primary question in dealing with the matters involved in a court of equity is the effect upon others of the facts established. It seems clear then that, inasmuch as each corporation has a set of books set up for the purpose of reflecting the transactions of that corporation and all these books were under the control of Fred Herrick, the creditors who dealt with each corporate entity in its corporate capacity are entitled to rely upon the facts as shown by the corporate books, and that Fred Herrick, having caused these entries to be made either by his own personal order or by the officials he had placed in office, could not justly insist upon modifying the effect of the book entries by oral testimony inconsistent therewith. With these general observations in mind we will turn to the specific facts as shown by the evidence and particularly as testified to by Fred Herrick.

It appears from his testimony that he used the Milwaukee Company as a depositary for funds derived by him from his various enterprises; that these assets were carried upon the books of the Milwaukee Company in a special account called the Fred Herrick advance account. As moneys were derived from other corporations owned by Fred Herrick, they were paid at his request to the Milwaukee Company and carried as a credit to him upon the books of the Milwaukee Company. As he drew out money from this fund for his various enterprises it was charged to this account. During the period involved in this litigation more than $2,500,000 was credited to this Fred Herrick advance account and less than two million was withdrawn therefrom. The money withdrawn from this account and paid to or for the account of or in connection with the transactions of the Herrick Lumber Company are those claimed by the appellee to establish a liability from the Herrick Company to the Milwaukee Company, or if not in favor of the Milwaukee Company, at least in favor of the Fred Herrick or the Export Company. The theory upon which the trial court decided this case was that, inasmuch as the funds advanced to or in the interest of the Herrick Company were derived from the possession of the Milwaukee Company, therefore, it would be presumed from this possession that the funds were owned by the Milwaukee Company, and being owned by that company that an im-

plied obligation to repay the company arose from the transaction. This view, however, seems inconsistent with the fact that the Milwaukee Company did not claim that this money belonged to it. It was treated upon the books of the company as the money of Fred Herrick, and when money was advanced to Fred Herrick or upon his order it was charged to this account in which there was most of the time, if not always, a balance in favor of Fred Herrick. No charge was set up in the books of the Milwaukee Company against the Herrick Company. If suit had been brought by the Milwaukee Company against Fred Herrick, the books of the company would be admissible in evidence against it as an admission on its part that the money advanced to Herrick was not claimed by it but was by the books of the company shown to be the property of Herrick.

The entries in the books of the Milwaukee Company are consistent with the testimony of Fred Herrick that the Milwaukee Company was utilized merely for convenience as an agency for receiving and disbursing his funds, and that the funds so received and so disbursed were in fact his own funds derived from other enterprises. Whether or not upon close analysis of the business of each corporation the moneys derived from the several corporate enterprises were in fact the property of Fred Herrick as distinguished from that of the corporation from whose funds the property was derived, is not ascertainable from the evidence and is not germane to the question involved here because the claim set up to establish the insolvency of the bankrupt corporation is that of the Milwaukee Company and not some other corporate or individual source from which the funds were derived. The Milwaukee Company which, it should be observed is merely another name for Fred Herrick, is not claiming that there is any indebtedness due it from Fred Herrick personally or from the Herrick Company. The claim is being made by the trustee in bankruptcy of Herrick Company, in his capacity as such trustee, and by him also on behalf of the Milwaukee Company, after the bankruptcy of Fred Herrick had thrown the Milwaukee Company into his hands as trustee for the Spokane Merchants' Association.

We now turn to the affairs of the bankrupt corporation. It is unquestioned that the entire capital of this corporation was furnished to it by Fred Herrick. The corporation was first capitalized for $500,000 and this money was paid into the treasury by Fred Herrick who took all the stock. Later additional funds were needed and steps were taken to increase the capital of the company to $2,000,000. Fred Herrick not only advanced the initial $500,000 necessary to construct the lumber mill of the Herrick Company, but he also advanced, through the medium of the Milwaukee Company, and other companies, $1,200,000 in addition thereto. He testified that these advances were intended as capital advancements; that he did not intend to create an obligation on the part of Fred Herrick Company to him for that amount, but intended that stock should issue to him in consideration of his advances. It is true that he did not sign any formal stock subscription. 500,000 shares of the initial issue were issued to him and in addition thereto a stock certificate for 1,200,000 shares was executed by the officers of the corporation, but the name of the stockholder was not inserted in the blank space intended therefor, and the stock certificate was allowed to remain in the books. Mr. Herrick testified that the reason why this stock was not issued was that he anticipated that the stock would be broken up into smaller blocks and issued when requested by him. The moneys received from Fred Herrick were credited to him on the books of the corporation. No evidence whatever of the indebtedness was issued to him. No credit was given to the Export Company or to the Milwaukee Company on the books of the Herrick Company for such moneys so advanced. A creditor examining the books of the Herrick Company for the purpose of ascertaining whether to extend credit to it would find no credit therein in favor of Fred Herrick or of the Milwaukee Company or of the Export Company. So far as the books of the corporation showed the Herrick Company owed them nothing. The advance made by Herrick to the company was fully covered by the certificate of stock disclosed by the corporate records and would fully account for the funds received by him and was in effect a declaration that such money was paid in as capital. The appellant bank, now in the hands of a receiver, extended credit to the Herrick Company in the sum of $49,446.56 and in so doing was entitled to rely upon the books of the corporation as disclosing its true financial condition. There is nothing on the face of the books of the corporation to indicate that it was insolvent at the time it secured the money from this bank, and it is clear that the loan would not have been made to an insolvent corporation if it were known to be such. It should be stated in this connection that the Herrick Company also had an account called the

Fred Herrick advance account, similar to that of the Milwaukee Company.

It is difficult to see how we could better ascertain the intent with which these various transactions were arranged and carried out than by the testimony of Fred Herrick as to his intent, for at the time of these transactions he was the Milwaukee Company, the Export Company, and the Herrick Company. It is difficult to see how these different companies could have an intent different from that of their owner, assuming that he was, as in fact he was, at all times in the active control and dominating the affairs of each of these corporations. There is no suggestion by the attorneys that Mr. Herrick was not testifying to the truth as he saw it when he stated that his advances to the Herrick Company were intended as capital. The indications in the record are that he did so intend. He testified that the money in the Fred Herrick advance account on the books of the Milwaukee Company was his own individual money, and this is not disputed. The appellee, however, says that this broad statement is somewhat modified by the statement of Mr. Herrick to the effect that the money in the Fred Herrick advance account was received from these various corporations. Mr. Herrick testified with reference to the advance account on the books of the Milwaukee Company, as follows:

"The reason for putting the money in in that way was that Mr. Palmer did the collecting for me in these accounts and the money came in there and if I wanted it paid out to any individual company he paid it out. The money that went in was my money and I was given credit for it in my personal account and as it was spent I had Mr. Palmer issue checks for it and it was charged to me. During those years there were many hundred of thousands of dollars handled that way, and during the latter part of the term I was sole owner of all of the stock of the Milwaukee Lumber Company and the other companies except the qualifying shares.

"The Fred Herrick Lumber Company was started in 1923. I furnished the money and subscribed for the original stock subscription. The capital stock was increased from $500,000 to two million dollars because I had put in more money than the $500,000. The arrangement from the inception was that I was to take stock for the money I put into the concern and that continued until the company was finally sold. During all these years from the beginning of the company until the sale to the Edward Hines Company I was continually putting money in, exclusively for stock, never for a loan."

The appellant claims that more than $3,000,000 was credited to the Fred Herrick advance account on the books of the Milwaukee Company, and that $2,217,216.44 had been disbursed from that account of which $500,000 was for the Herrick Company. Appellee, on the contrary, contends that the Fred Herrick advance account on the Milwaukee Company's books showed a transfer to that account of $2,953,000 of which $923,000 was made up of surplus account and capital stock account, which appellant asserts are mere bookkeeping entries, leaving only $2,000,000 in the account, of which he claims $446,000 is another mere bookkeeping entry, transferring of credit from the Export Company, and that no cash was involved. In short, that the total amount of credits in this account was $1,500,000 and that this account was overdrawn $200,000 in excess of the $500,000 advanced to the Herrick Company. This contention is based upon the evidence of an expert accountant, M. D. Wells, employed by the trustee in an attempt to unravel the affairs of these various corporations. He states that the credit items on the Fred Herrick advance account included a transfer from the surplus account of the Milwaukee Company of $323,495.65, also a transfer from the capital stock account of $600,000 apparently based, he states, upon a cancellation of stock held in the Milwaukee Company by Fred Herrick, and a corresponding reduction of the capital in the Milwaukee Company's account. He states there were, however, credits to Mr. Herrick of money which he undoubtedly got either from his other operations or borrowings from the bank, and various other sources, such as the Export Company and various associated companies. The principal credit items objected to by him in this account were that of the $323,495 from the surplus earnings of the Milwaukee Company which is credited to Fred Herrick without the formality of resolution of the board of directors declaring a dividend, and that of the transfer of $600,000 from the capital stock account of the company upon the surrender and cancellation of that amount of stock held in the Milwaukee Company, and that of the transfer of $446,000 from the funds of the Export Company to the Milwaukee Company. It is not claimed that any of these entries were fraudulent or dishonest in any sense. There was a reasonable basis for the credit to the sole stockholder of

the surplus earnings of the company and also for the credit to him of the value of stock surrendered by him, even if we assume that the Milwaukee Company could recover that amount from him for the benefit of its creditors, if any (there being no other stockholders to be affected thereby). The question here, then, is this: Can the Milwaukee Company follow the funds which it has thus credited to Herrick on its books as his funds, as its own funds in the hands of those to whom he directed it to be paid or to whom he transferred it? In other words, can it be said that the Herrick Company owes money to the Milwaukee Company when the books of that company show that the money was paid to Herrick, and when in fact it was paid out on his order? The corporation commingled all these funds credited to Herrick. If we deduct from the advance account the credits under discussion it would follow that the Fred Herrick advance account was overdrawn, but it does not follow that any of the money derived from the two items improperly credited to Herrick's account was diverted to or went into the coffers of the Herrick Company. There was in addition to these sums nearly $2,000,000 paid by the Milwaukee Company from the Fred Herrick advance account. In any event all moneys in this account were paid out to or upon the order of Fred Herrick, and the corporation accepted his obligation to replenish that account as the consideration for the advance. So long as the corporation was solvent and Fred Herrick was the sole stockholder nobody was concerned in the regularity of the corporate proceedings, and the most the creditors were entitled to would be the repayment by Herrick to the company of any moneys advanced to him in excess of the amounts due the corporation. The Milwaukee Company was fully advised as to the destination of the moneys paid from Fred Herrick advance account. The funds were disbursed directly by the officers of the Milwaukee Company to the final recipient. Some of this money was advanced to the Herrick Company directly, and some of it was paid to creditors of that company. In neither event was any charge made on the books of the Milwaukee Company against these creditors or against the Herrick Company, nor was any corresponding entry made upon the books of the Herrick Company showing an advance to it by the Milwaukee Company. On the contrary, although the books of both corporations were under control of Fred Herrick they are both consistent with the claim of Fred Herrick

that the money he paid in the Herrick Company or paid out on its behalf was upon an obligation assumed by him to purchase the entire stock of the Herrick Company and as a part of the purchase price thereof, and that the advances made by the Milwaukee Company were made to him personally and not to the Herrick Company. In view of this situation there is no basis for the contention that there was an implied obligation from the Herrick Company in favor of the Milwaukee Company that the relation of debtor and creditor arose between the Milwaukee and the Herrick Company. If there were a prima facie presumption to that effect arising from the fact that the money paid to it for the Herrick Company was derived from the Milwaukee Company, it is overcome by the showing that the money was not advanced to the Herrick Company but was advanced to Fred Herrick personally and paid by him into the Herrick Company as a part of its capital to be evidenced by certificate of stock in the corporation issued to him.

With reference to the amount of indebtedness, $60,000, claimed to be due from the Herrick Company to the Export Lumber Company, we have substantially the same situation. Of this amount $50,000 was advanced by the Export Company to the Herrick Company and was represented by a deposit to the credit of the Herrick Company in its bank account at Burns. The other $10,000 represented payment on behalf of the Herrick Company of a note held by the Washington National Bank at Ellensburg.

These moneys were advanced by the Export Company on the order of Fred Herrick and were charged upon the accounts of that company to Fred Herrick personally in conformity with the practice of the Milwaukee Company. In other words, they were treated as an advance, not to the Herrick Company, but to Fred Herrick personally. The claim of the indebtedness of $91,000 to Fred Herrick personally is also answered by the testimony of Fred Herrick that the money was paid to the Herrick Company in pursuance of his intention to purchase stock and as a part of the purchase price thereof.

The testimony of J. C. Palmer, an officer of the Milwaukee Company, and of James W. Girard, an officer of the Herrick Company, is consistent with the proposition that the money advanced by the Milwaukee Company to the Herrick Company was advanced to Fred Herrick and not to the Herrick Company, and that such money was paid into

the Herrick Company on account of the purchase price of the capital stock of that company by Fred Herrick. For these reasons I am satisfied that the Fred Herrick Company was not insolvent at the time of the payment made by it to the Exchange National Bank.