### In re FOX WEST COAST THEATRES.*

### TALLY et al. v. FOX FILM CORPORATION et al.

#### No. 8210.

Circuit Court of Appeals, Ninth Circuit.

Jan. 13, 1937.

As Modified on Denial of Rehearing
Feb. 23, 1937.

Wm. H. Neblett, of Los Angeles, Cal., for appellants.

Oscar Lawler, of Los Angeles, Cal., Alfred Sutro, of San Francisco, Cal., and Alfred Wright, of Los Angeles, Cal., for appellees Twentieth Century Fox Film and Nat'l Theatres Corporation.

Walter K. Tuller, Pierce Works, Homer I. Mitchell, and W. B. Carman, Jr., all of Los Angeles, Cal., for appellees Skouras and others.

John B. Bertero, of Los Angeles, Cal., for appellee Fox West Coast Theatres.

P. N. McCloskey, of Los Angeles, Cal., for appellee S. W. McNabb.

George E. Farrand and Leonard B. Slosson, both of Los Angeles, Cal., for appellee Albert W. Leeds.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

The Fox West Coast Theatres, Inc., on February 27, 1933, filed a petition in voluntary bankruptcy in the District Court of the United States for the Southern District of California, in the form provided therefor by the Supreme Court (11 U.S.C.A. following section 53, p. 58). It alleged therein "that it owes provable debts which it is unable to pay in full, that it is willing to surrender all of its property for the benefit of its creditors and that it desires to obtain the benefit of the acts of Congress relating to bankruptcy."

Petition for Appointment of Receiver in Bankruptcy.

Accompanying the petition in bankruptcy was a petition of the alleged bankrupt for the appointment of a receiver. It was alleged in this petition that the "bankrupt is engaged in the business of operating motion picture theatres and exhibiting motion pictures and other forms of entertainment therein and in holding stock in other companies engaged in like business." It was alleged that the bankrupt was the lessee and operator of forty-two theatres described by name in the petition and that it owned capital stock of various corporations therein named in amounts therein stated; among others, four corporations were named in which the bankrupt owned all the stock, namely, Fox West Coast Theatres, Corporation, Carthay Circle Theatre Company, East River Theatre Corporation, Pantages' Hollywood Theatre, Ltd., and Screen-Mirror, Ltd. It was alleged that these subsidiary corporations operated either directly or through their subsidiaries 375 theatres located in thirteen states; that on February 25, 1933, it had sold and transferred to the Fox Riverside Theatre Corporation, and other newly formed corporations, thirty-eight theatres with their leases and equipment "in order to segregate such properties of the bankrupt as are presently profitable and can be operated conveniently as a unit, and to facilitate the administration of the estate and increase the distributable share of each creditor"; that the entire capital stock of the Fox Riverside Theatre Corporation, and of the other newly formed corporations to which these assets had been transferred, plus a demand promissory note, was issued to the Fox California Theatres Corporation, which in turn issued all of its stock plus a demand promissory note for $1,630,000 to the Fox West Coast Theatres Corporation; and that the latter corporation issued all of its capital stock plus a demand promissory

note for $1,630,000, to the bankrupt. In addition to the theatres transferred, as aforesaid, certain stock owned by the bankrupt was transferred to the Fox West Coast Theatres Corporation the names and amounts being specifically detailed in the petition. By this process the bankrupt exchanged certain of its theatres and properties for stock which in turn represented those properties plus a promissory note. The agreement of transfer of the property of the corporation contained a provision that if within six months a receiver or trustee had been appointed for the alleged bankrupt the receiver or trustee "shall have the unqualified right within sixty days from and after his appointment and qualification to rescind the contract, subject to the approval of the appointing court." In the petition for appointment of receiver, it is stated that the net result of the transfers therein alleged "is the creation of a system of theatres constituting * * * a presently self-sustaining group, which can be operated as such with a minimum of effort by the receivers and trustee." It is pointed out that the appointment of a receiver, and the continuous operation of the theatres, are necessary in order to preserve the good will of the several theatres and to protect the rights of the bankrupt in its rental agreements of sound producing equipment under leases which "authorize the lessee to repossess itself of such equipment in case of default in the terms of such rental agreement." It is also pointed out that if a receiver is not appointed and the theatres are closed "for the period of adjudication," a large part of the value of the assets of petitioner may be impaired and destroyed. It is alleged that the principal creditors of the petitioner are the Wesco Corporation in an amount in excess of $13,000,000, and the Fox Film Corporation in an amount in excess of $2,000,000, constituting at least 75 per cent. in amount of all the creditors "excluding contingent liabilities of your petitioner." The two creditors named joined in the request for appointment of a receiver, and on the same day (February 27, 1933) and before the adjudication in bankruptcy, Charles P. Skouras was appointed receiver. Later in the day John Treanor was appointed coreceiver. Skouras, on the same day, appointed his attorney and peti-

tioned the court to approve the appointment. The appointment was approved.

On the next day, February 28, 1933, an order adjudicating the petitioner Fox West Coast Theatres a bankrupt was made, and on March 1, 1933 the bankruptcy proceeding was referred to Samuel W. McNabb, referee in bankruptcy.

Thereafter, the property of the bankrupt was administered in the bankruptcy court. Three hundred fifty-three claims aggregating $43,294,552.35 were filed and were allowed in the sum of $15,443,388.16, which included expenses of administration incurred, aggregating $638,757.78. The above transfer of the bankrupt's property made February 25, 1933, and disclosed to the court in the petition for the appointment of receiver two days later, was formally approved by the trustees in bankruptcy in their report filed July 29, 1933, and by the referee in bankruptcy December 6, 1933. No appeal was taken from this order.

Among the claims in bankruptcy was that of one of the appellants, T. L. Tally, upon his lease with the bankrupt, allowed for the sum of $6,634.85. This claim was sold by Tally to the Fox Film Corporation for the face value thereof. In addition thereto Tally, who was the owner of one of the theatre properties leased by the bankrupt, assigned to National Theatres Corporation a note and mortgage securing his lease in the amount of $50,000 in consideration of the payment to him by the National Theatres Corporation of the sum of $49,064.89 and the trustees in bankruptcy released their claim to the equipment in Tally's theatre by consenting to dismissal of their appeals from the order of the District Court confirming title in Tally. Mutual releases were then exchanged by Tally, the National Theatres Corporation, and the trustees in bankruptcy.

Under Tally's lease the limit of the liability of the bankrupt was the security held by him, consisting of the equipment in his theatre (appraised at $20,000) and the note and mortgage ($50,000).[1] The net result of these transactions was that Tally secured $55,699.74 in cash and acquired title to the equipment in his theatre appraised at $20,000, and has transferred his

---

[1] The lease provides: "It is further understood that the limit of the liability of the lessees under this lease, shall be the security given by the lessees for the faithful performance hereof, to-wit, the personal property hereinabove mentioned and the mortgage ($50,000) or substitute therefor."

rights under the lease to the National Theatres Corporation in consideration therefor.

The relation of the appellant Corbar Corporation to the bankrupt may be briefly stated as follows: It had leased two theatres to the Far West Theatre Corporation, one in Pasadena and one in Los Angeles, and the obligation of the lessees had been guaranteed by the bankrupt. On May 9, 1933 the Far West Theatre Corporation and Corbar Corporation had entered into an agreement which provided that the leases be terminated and liability theretofore or then existing be cancelled in consideration of the payment by the Far West Theatre Corporation to Corbar Corporation of $2,500 and the surrender by the Far West Theatre Corporation of its right to the equipment in the theatres appraised at $45,000. The trustees in bankruptcy deeming the Far West Theatre Corporation a subsidiary of the bankrupt sought authority from the referee to consent to the settlement made by its subsidiary, and the transaction was approved by the referee May 16, 1933. On December 6, 1933, the stock of this subsidiary became vested in the trustees for the bankrupt estate.

Thereafter the property of the bankrupt was sold to the National Theatres Corporation, formerly the Wesco Corporation, the sole stockholder of the bankrupt, for an amount equivalent to the face value of the allowed claims plus the expense of administration. The claims, excepting one for about $1,000,000 for income taxes which was assumed by the purchaser with the consent of the government, were thus paid in full.

On September 18, 1935, an order was made closing the bankrupt proceedings.

### Appellants' Petition.

Thereafter, on December 6, 1935, the appellants Tally and Corbar Corporation filed a petition in the bankruptcy matter and gave notice of the filing of said petition on behalf of themselves "and creditors similarly situated" and that they would move the court on February 3, 1936, "to set aside the adjudication in bankruptcy" upon the ground "that extrinsic fraud was practiced upon the court and that the adjudication is void because the judge of the court who rendered it was disqualified." In the notice of motion it is stated that the motion is to be made upon the pleadings, records and files in the case and upon the petition to set aside the adjudication and amendments thereto. In the petition filed by appellants it is alleged on information and belief that on the date the petition in voluntary bankruptcy was filed (February 27, 1933) "the ascending line in the bankrupt's corporate family was that all the stock of Fox West Coast Theatres, the bankrupt, was owned by the Wesco Corporation, a Delaware corporation, whose name has been changed to National Theatres Corporation, all of whose stock was in turn owned by the Fox Film Corporation, a Delaware company, the majority of its stock being owned or controlled by the Chase National Bank of the City of New York, a national banking institution." It is alleged that: "These corporations were in effect a single entity and conspired to act as such, to perpetrate the frauds hereinafter alleged. They used, in consummation of the fraud, the fiction of corporate entities, which they manipulated so as to conceal from the court their true relation to each other, together with the facts constituting the extrinsic fraud practiced upon the court in these proceedings, as hereinafter alleged." Also, it is alleged on information and belief that the conspiracy was formed on or about December 26, 1930, between the Chase National Bank of the City of New York, the Fox Film Corporation, and the Wesco Corporation and the bankrupt; that the purpose of the conspiracy was to cause the bankrupt to appear to be insolvent "so that it could be put through bankruptcy and there discharged of all of its contracts, winding up with its properties owned by this same related family group of corporations under changed names in some instances, discharged of its obligations, all of which was concealed from the court at the time of the adjudication herein."

At this juncture we pause to state that the appellants now concede that a corporation may apply for and secure an adjudication in voluntary bankruptcy regardless of whether or not it is actually insolvent. We quote from their brief in that regard: "The main course of argument running through the entire document [appellees' brief] supported by numerous citations of authority, is that any qualified person or corporation may become a voluntary bankrupt, and that its solvency or insolvency is immaterial. There is no necessity for argument on these points. They are well established."

218

See In re Lachenmaier (C.C.A.) 203 F. 32, 34; Bell v. Blessing (C.C.A.9), 225 F. 750; In re Southern Arizona Smelting Co. (C.C.A.9) 231 F. 87. See also, Remington on Bankruptcy, § 48, p. 88, where it is stated: "Insolvency not requisite to voluntary bankrupt.—Nor is it necessary that he [the petitioner] be insolvent. The reason of this is probably that, if he be solvent, it is nobody's business but his own if he chooses to have his creditors paid through the machinery of the bankruptcy court; and if on the other hand, he be actually insolvent, why then he ought to go into bankruptcy."

The appellants, after thus stating the names of the conspirators and the purpose of the conspiracy, allege certain transactions characterized as overt acts.

The first overt act thus alleged is the declaration of a dividend of $8,000,000 by the bankrupt on the 27th day of December, 1930. It is alleged that this declaration of dividend was a "withdrawal and reduction of the capital stock of the bankrupt, a California corporation, prohibited by section 309 of the Civil Code of the State of California, in force at the time."[2] It is alleged that this dividend was never paid, although false entries were made in the books of the bankrupt showing payments; that false entries were also made in the books of the Wesco Corporation owning all the stock of the bankrupt and these entries were made "for the purpose of creating fictitious claims against the bankrupt so that it might be shown to be insolvent and could be adjudicated a bankrupt and thereby discharge itself of certain of its obligations for the benefit of its parent corporations, Wesco Corporation, Fox Film Corporation and Chase National Bank of the City of New York."

It is alleged that about the same time another false entry was made on the books of the bankrupt in order to lend color to the dividend, in that "the very leasehold interests which this fictitious dividend was designed to protect were carried upon the books of the bankrupt as an asset of $8,505,182.11." It is alleged that this $8,000,000 dividend was more than half the amount of the approved and allowed claims against the bankrupt estate and was used by the conspirators to deceive the court at the time of adjudication into believing the

bankrupt was insolvent, and that this claim constituted over 50 per cent. of the bid that was made and accepted by the family holding companies to reacquire the properties of their subsidiary, the bankrupt.

The next overt act charged is the transfer on February 25, 1933, of the leases which were described in, and the transfer set forth in, the petition of February 27, 1933, for the appointment of the receiver above referred to. It is alleged that this transfer was in violation of sections 3439 and 3440 of the Civil Code of California, in that it was made with the intent to hinder, delay and defraud appellants "and other lessors and creditors similarly situated." It is alleged that this transfer was made without any consideration whatever and was done wholly in contemplation of insolvency and with intent to defraud appellants.

The third overt act alleged to have been done in pursuance of the alleged conspiracy is a concealment from the court of the fact that the entire capital stock of the bankrupt was owned by the Wesco Corporation "and that if any debts of any sort were owed by the bankrupt and Wesco or any other person, Wesco Corporation in turn as sole stockholder was liable for the whole of the obligations under section 322 of the Civil Code of California as it stood at that time." This allegation of liability is a conclusion of law. The liability exists for only three years after the obligation is created. Cal.Code of Civil Procedure, § 359; Hunt v. Ward, 99 Cal. 612, 34 P. 335, 37 Am.St.Rep. 87.

It is next alleged as an overt act that the property of the bankrupt was appraised at $12,507,019.03 and that claims were approved and allowed in the sum of $15,443,388.16, and that the National Theatres Corporation, formerly the Wesco Corporation, bid $15,443,388.16 at private sale for the bankrupt's assets and paid this sum in part by giving its receipt for $14,610,905.14.

The alleged illegality of these transactions is predicated in the petition upon concealment of the statutory liability of the stockholders of the bankrupt for the debts of the bankrupt under section 322 of the California Civil Code and upon the alleged fictitious character of the dividend for $8,000,000.

[2] The gross income of the bankrupt during the year 1930 was over $44,000,000. The income decreased in 1931 by $5,000,000 and in 1932 by $12,000,000 more.

The last overt act charged as such was that the referee in bankruptcy was prevailed upon to accept $75,000 as his fee when he would have been entitled to $154,433.88.

It is alleged that these overt acts "were deliberately concealed by the conspirators, and each of them, their attorneys, officers and agents, from the Judge of the United States District Court who made the order of adjudication herein, and that the adjudication would not have been made if any of the overt acts herein had been brought to the attention of the Judge or had been known to him, nor would the sale have been approved."

It is alleged that as the result of the conspiracy the leases held by the appellants with the bankrupt were disaffirmed to the damage of appellants Tally, in the sum of $483,548.61, and to the damage of the Corbar Corporation in the sum of $620,251.81, and that the bankruptcy was used by the conspirators to write down or reform hundreds of other contracts of leasehold and mortgage with the consequent damage to the holders of these contracts in a sum in excess of $25,000,000.

The appellants prayed that the adjudication in bankruptcy be set aside and declared void and of no effect; that a receiver be appointed for the bankrupt and for the Fox West Coast Theatres Corporation, and all the other subsidiaries; that the Chase National Bank, the Fox Film Corporation, the Wesco Corporation, and the National Theatres Corporation account to and pay to the receiver the sum of $25,000,000, or such other sum as the court might fix for damages suffered by the appellants and others; that the court render judgment against attorneys and officers who received fees and expenses of administration amounting to $638,757.78 for the amount of such fees with interest; that Wesco Corporation, Fox Film Corporation, and Chase National Bank be required to pay in to the receiver as stockholders owning the entire stock of the bankrupt, the entire amount of its claimed indebtedness at the time of the bankruptcy; *that out of the moneys received, the rentals on all disaffirmed leases be paid to date in accordance with the original terms of the obligations;* for attorneys' fees and costs.

### Amendment to Appellants' Petition.

On the 30th of December, 1935, the appellants filed an amendment to the petition alleging that on September 26, 1930, which was before the $8,000,000 dividend was declared, a son-in-law of the judge, who subsequently sat in the bankruptcy proceedings, was a director and secretary of the bankrupt; that he was such director and secretary on February 25, 1933, at the time the bankrupt transferred its assets in exchange for corporate stock of the newly formed corporation, as hereinbefore stated, and that at that time his resignation was tendered and accepted, but that notwithstanding that fact he remained in the same position throughout the bankruptcy at the same salary; that the resignation of the director and secretary was planned in view of the fact that the bankruptcy proceedings might be assigned to the Judge who was father-in-law of the secretary. It is alleged that the son-in-law remained with the bankrupt corporation throughout the bankruptcy administration and is now one of the managing officers of the Fox West Coast Theatres Corporation; that this corporation owns the controlling stock of 100 subsidiary corporations, in many of which the son-in-law is a director, and in all of which he is secretary. It is further alleged that Samuel W. McNabb, referee in bankruptcy, was United States Attorney, and that he resigned his office of United States Attorney on February 28, 1933, for the purpose and with the understanding that the Fox West Coast Theatres' bankruptcy matter was to be referred to him; that there were already three referees in bankruptcy in the county and that McNabb, the fourth referee, had been selected by the "conspirators" for appointment as referee; that on February 25, 1933, it was ordered that the bankruptcy petitions filed during the month of March should be referred to McNabb; that he was not sworn in as referee until March 1, 1933. It is further alleged that on March 1st after McNabb had qualified, a separate order was made referring the case to him; that on November 22, 1934 during the absence of Referee McNabb, Referee Moss confirmed the sale of all the properties of the bankrupt to the National Theatres Corporation; that a petition to revise the same was filed and heard December 22, 1934, by a Judge of the District Court of the United States other than the father-in-law of the bankrupt's secretary, and that such order confirming the sale was made by the judge without knowledge of the "fictitious" character of the bid, without knowing of the "disquali-

fication" of the other judge, and without knowledge of the "fictitious" dividend declared by the bankrupt which made up the majority of the claims held by Wesco, of the "fraudulent" transfer of February 25, 1933, of the ownership of all the stock of the bankrupt by the claimant, of the liability of the stockholders of the bankrupt under California Civil Code, section 322, and of the fact that the referee had agreed to cut his fee to less·than half that provided by law. It was further alleged that the Referee Moss, who confirmed the sale, had an agreement with the three. other referees in bankruptcy by which they agreed to pool and divide equally all the fees obtained by them from bankruptcies administered in their respective courts; that Referee Moss confirmed the sale although he knew of the fictitious character of the bid "because he had an interest in the order by way of one-fourth of the fee which sum he would lose if the bid were not confirmed." Appellants alleged that the other three of the four judges of the District Court of the United States for the Southern District of California are material witnesses in the case; that the appellants did not discover the relationship of the judge to his son-in-law until after December 5, 1935.

There are other allegations in this amendment to appellants' petition which were subsequently stricken out as scandalous, to which we will presently refer.

Judge Cosgrave, before whom the appellants' motion was noticed to be heard on February 3, 1936, disqualified himself after the filing of the amendment to the petition in which it is alleged that he was a material witness in the case, and the Senior Circuit Judge assigned United States District Judge James Alger Fee of the District Court of the United States for the District of Oregon to hear the matter. On January 31, 1936, answers were filed on behalf of all the persons subpœnaed except the Chase National Bank of the City of New York which had not been served. Motions were made by the appellants to strike out the answers. Affidavits were filed in opposition to appellants' motions by each of the four judges of the District Court of the United States for the Southern District of California, by the son-in-law of the judge, and by Referee McNabb, and the case was called for hearing before Judge Fee on February 6th. The court announced· at the opening of the argument that it would first consider the question of the jurisdiction of the court in bankruptcy to reopen the bankruptcy proceeding after it had been closed by formal order. During the argument the appellants withdrew their charges that the judge who signed the adjudication of bankruptcy had participated in the alleged conspiracy and also the charge or implication that any of the other District Judges or that referee McNabb were parties or part and parcel of the conspiracy, stating, "that it is not the intention of that petition, and that is ·not the intention of counsel who has·made this argument." This declaration was made several times in varying forms, but the admission was clearly, definitely, and deliberately made by the appellants speaking through their attorney. Thereafter, Judge Fee filed a written opinion holding that the court had· no jurisdiction to entertain the application for the vacation of the order of adjudication of bankruptcy. However, in his lengthy and well-considered opinion denying jurisdiction, Judge Fee said:- "The court would be bound to try charges of participation in a fraudulent compact by its own officers, because such control of their official conduct would destroy jurisdiction to perform judicial acts. All allegations .which contained such implications however, have been stricken from the petitions upon a definite and distinct avowal of counsel for petitioners in open court that no such charges were intended to apply to any of. these officials." The petition was therefore dismissed. An appeal is taken from the order of the District Court dismissing the petition.

Subsequently, the appellants filed a motion for leave .to file an amended petition. In the proposed amended petition the charges of corruption which had formerly been withdrawn, but which Judge Fee held would have vested the court with jurisdiction, were renewed and amplified.

Inasmuch as the order dismissing the original petition and the amendment thereto must be considered without reference to the allegations of the petition which had been withdrawn, and inasmuch as the application to file the amended petition was addressed to the sound discretion of the trial judge, we will defer a consideration of the nature and effect of these allegations of wrongdoing by the judge and referee until after we have considered the appeal from the order dismissing the ap-

pellants' original petition and the original amendment thereto. In considering that question, it is to be observed that practically all orders in bankruptcy are appealable within thirty days either as a matter of right or of grace (Bankr.Act §§ 24, 25, as amended 11 U.S.C.A. §§ 47, 48) and that in the absence of an appeal the orders become final. The order allowing claims becomes final upon the order of closure (11 U.S.C.A. § 93(k). We thus have a situation where the order of adjudication of bankruptcy, the orders allowing claims in bankruptcy, the order approving the claims of appellant Tally in part, the order of sale, and the order of confirmation of sale, and the order for the distribution of the assets, have all become final by reason of the failure to appeal from these orders within the period fixed by law. (See Bankr.Act §§ 24, 25, as amended June 7, 1934, 48 Stat. 926, 11 U.S.C.A. §§ 47, 48). Furthermore, the bankrupt estate has been formally closed and this order of closure has become final.

■ Before considering appellants' contentions in detail, it should be stated that the adjudication of bankruptcy necessarily and properly resulted from the filing of the petition in bankruptcy. The property of the bankrupt was rightfully in the possession of the bankruptcy court and the filing of the voluntary petition was authorized by the bankrupt. We have already pointed out that although the alleged purpose of the conspiracy was to make the bankrupt appear insolvent, appellants now concede, as they must, that it is not necessary for a voluntary bankrupt to be insolvent in order to take advantage of the provisions of the Bankruptcy Act (11 U.S.C.A.). It should further be observed that although appellants charge that the bankrupt and its stockholders "conspired" or agreed with one another to take advantage of the provisions of the Bankruptcy Act, such an agreement is lawful.

■ As an illustration of the obvious principle that fraud cannot be predicated upon an application of a bankrupt to secure the benefits of a law enacted for that very purpose, although the effect of it will be to defeat the claim of a creditor in toto, see Royal Baking Powder Co. v. Hessey (C.C.A.) 76 F.(2d) 645, 650. In that case, the bankruptcy petition was filed three days before the entry of a judgment in another court in an action for tort. The person injured by the tort could not prove her claim in bankruptcy unless it had been reduced to judgment before the filing of the petition in voluntary bankruptcy. After the court in which the tort action was pending had tried the case and announced its decision and its proposed findings of fact and conclusions of law, the petition in voluntary bankruptcy was filed, three days before the judgment. It was held that this transaction was not a fraud upon the bankruptcy court and that the agreement of the bankrupt with its principal creditor and stockholder to file such petition was not such "collusion by the bankrupt and others, as would justify the allowance of the claim [for tort] or the vacating and setting aside of the adjudication in bankruptcy." See, also, Bank of Elberton v. Swift (C.C.A.) 268 F. 305.

It follows that the allegations of the appellants' petition constitute no grounds for the setting aside the adjudication of bankruptcy and that the order of adjudication was valid unless the alleged disqualification of the judge who made it rendered it void, a point we will consider later.

■ Appellants rely upon the principle of extrinsic fraud. The authorities upon which the appellants rely are those in which the alleged voluntary bankrupt had not authorized the filing of the petition [Zeitinger v. Hargadine-McKittrick Drygoods Co. (C.C.A.) 244 F. 719; Hanna v. Brictson Mfg. Co. (C.C.A.) 62 F.(2d) 139], or where the court had no jurisdiction over the bankrupt [In re Garneau (C.A.) 127 F. 677] or in which courts of equity have exerted their authority to ignore a judgment obtained by extrinsic fraud by prohibiting the fraudulent party from reaping the fruits of the fraudulent judgment or decree. Hewitt v. Hewitt (C.C.A.) 17 F.(2d) 716. Where the party who has committed the fraud has already reaped the benefit of the fraud by securing possession of property rightfully belonging to the other party, equity courts have decreed that the property should be held by the defrauded party in trust for the parties defrauded and has made appropriate orders to secure to the victim property of which he had been defrauded. Hewitt v. Hewitt, supra. These principles concerning extrinsic fraud, as applied by courts of equity, have no application to the adjudication of bankruptcy in the case at bar where the bankruptcy court had juris-

diction over the bankrupt by virtue of its petition in voluntary bankruptcy, and only would be relevant if at all in connection with the further proceedings in bankruptcy.

From what we have said it would seem clear enough that the bankruptcy court in the case at bar had no jurisdiction to vacate the adjudication of bankruptcy and that the District Court has rightly so decided. We will give further attention, however, to appellants' claim that the order of adjudication should be set aside because of extrinsic fraud upon the court and parties. Fraud involving matters or issues litigated, or which might have been litigated, in the main proceeding, or involving false or perjured testimony therein, is intrinsic. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719.

What then is the fraud upon which the appellants rely and which they claim is extrinsic?

Concealment: Appellants claim that the relationship of the Wesco Corporation to the bankrupt, and the relationship of the Fox Film Corporation to the bankrupt, and that of the Chase National Bank of the City of New York, was concealed from the court. This concealment is claimed to be fraudulent and wrongful because the Wesco Corporation was liable for all the debts of the bankrupt under section 322 of the Civil Code of California as it existed at the time of the bankruptcy. The claim is that when the bankrupt corporation in 1930 illegally declared a dividend of $8,000,000, thus apparently becoming indebted to its sole stockholder in that amount, the sole stockholder ipso facto became indebted under the law of California "individually and personally" for the payment of the dividend to itself, and, consequently, as it owed itself the sum of $8,000,000 the bankrupt corporation did not owe anything. This novel claim cannot be maintained. First, it has been held by the California Supreme Court in Williams v. Carver, 171 Cal. 658, 154 P. 472, that the liability of a stockholder under section 322 of the California Civil Code is not an asset of the corporation, but that it is a direct liability to the creditor which can be enforced by the creditor. Consequently, where the creditor is also a stockholder, it could not be liable to itself for the debt. Second, under section 322a Cal.Civ.Code, where the stockholder of a corporation is compelled to discharge a portion of the debt of the corporation under its statutory stockholders' liability declared by section 322 of the Cal.Civ. Code, he is entitled to be subrogated pro tanto to the claim of the creditor.

So far as the leases of both appellants are concerned, it is conceded that the liability of Wesco Corporation as a stockholder of the bankrupt to them was barred at the time the bankruptcy proceeding was instituted. Furthermore, there was no concealment. It appears from the exhibits referred to in the appellants' petition that as early as April 11, 1933, at the first meeting of creditors for the election of trustees, it was disclosed that 100 per cent. of the stock of the bankrupt was owned by "a concern called Wesco and in turn, practically 100 per cent. of the stock of Wesco is owned by the Fox Film Corporation, and in turn that the majority of that stock is owned by the General Theatres Equipment Company, and in turn that stock is owned by the Chase Securities Company, which is a subsidiary of the Chase National Bank of New York." In the claim filed by the Wesco Corporation for $16,862,318.86 it was stated that at the time of the declaration of the $8,000,000 dividend it was "then the owner of all the issued and outstanding stock of the bankrupt." It was alleged that "throughout the period embraced in said account [1927 to 1933] the bankrupt was a subsidiary of claimant." The books of the bankrupt were in the custody of the court. Hence, there was not only no concealment of the interrelation of the corporations involved, but the door of inquiry was opened wide by the claim itself. See Moffett v. Robbins (C.C.A.10) 81 F.(2d) 431, and cases there cited, by Judge Bratton.

The Corbar Corporation proved no claim in bankruptcy and its contingent claim which might have been proven in bankruptcy had been paid by the Far West Theatre Corporation and that payment had been approved by the trustees in bankruptcy. Appellants do not claim to have suffered by reason of the payment of the claim of the Wesco Corporation which they allege was invalid. Their claims were paid in full. Their sole contention of injury is that by reason of the bankruptcy proceeding their respective leases were disaffirmed and they have thus been deprived

of the benefit of the excessive rentals therein reserved. [3] But when they concede, as they must and do, that the bankrupt had the right to file the petition in voluntary bankruptcy and that the adjudication of bankruptcy follows as of right, they have shown no legal injury which can be redressed in the courts.

In view of our conclusion we briefly mention other alleged overt acts contained in the appellants' petition. Assuming that the declaration of the dividend of $8,000,000 by the bankrupt in December, 1930, violated the California statute (Cal.Civ.Code 1929, § 309), in that it impaired its capital, the appellants were not injured thereby. Furthermore, the allowance of the claim of the Wesco Corporation, the sole stockholder of the bankrupt, in so far as it determines the validity of this dividend is res judicata and no extrinsic fraud is alleged in relation to its allowance.

With reference to the appellants' claim that the transfer of some of the assets of the bankrupt on February 25, 1933, to the newly formed corporations above referred to in exchange for their stock, was a violation of the Corporate Securities Act of California (St.Cal.1917, p. 673, as amended), and that it was fraudulent as hindering and delaying creditors under the law of California, it is clear that this transaction did not prejudice the appellants or the other creditors of the bankrupt, as the stock received in exchange for the property was sold with other property for sufficient to pay all creditors. Moreover, that transaction was expressly approved by the trustees and by order of the referee and no appeal having been taken from that order, it is res judicata, and no extrinsic fraud is alleged in relation to the order of approval.

With reference to the contention of appellants that $25,000,000 claim for damages by them and other lessors were forestalled by the bankruptcy proceeding, it is sufficient to say that these claims were defeated by the bankruptcy itself, and that

---

[3] As showing the contention of the appellants in the case at bar that what they really seek to overcome is the adjudication in bankruptcy as it affects their right to collect rent, we quote the following colloquy occurring at the opening argument:

"Judge Wilbur: I have glanced at the case, and presume my associates have also. I would like to suggest that you advise us as to the status of the plaintiffs here. I infer from the record that their claims have been paid in full, or settled in full.

"Mr. Neblett: That is correct, your Honor. The claims allowed have been paid.

"Judge Wilbur: What is their interest in the transaction, then?

"Mr. Neblett: The interest in the transaction?

"Judge Wilbur: I mean in the controversy.

"Mr. Neblett: If your Honors please, I might say that their claims having been allowed in a certain amount and having been paid, of course they would have no interest in the bankruptcy as such. The interest they do have is that they have been reduced to this condition of impotency by judgment of adjudication which we claim, and which we propose to show the court, was brought about by the frauds that we charge in our briefs.

"Judge Wilbur: I do not want to spend too much of your time on this matter, but assuming that this bankruptcy was set aside in what condition would your clients be?

"Mr. Neblett: They would be in a position to collect the leases and they would then be in a position to collect their rents. That is the theory on which we would proceed.

"Judge Wilbur: The question is whether the bankruptcy properly deprived you of your rents?

"Mr. Neblett: That is it exactly. If it had not been for the supervening bankruptcy the leases would have gone on unimpaired, and, according to the record, our clients would have been able to have collected by the nature of the terms of their leases, some $715,000, in rent in addition to the taxes on the property.

"Judge Wilbur: Is this true—I am just asking—from the record is it true the claims of Tally and the Corbar Corporation were compromised by fixed agreement, the amount due?

"Mr. Neblett: There was a compromise on certain features of both contracts. Our answer is that they were not free agents in making the contract—

"Judge Wilbur: I was just trying to get your idea.

"Mr. Neblett: —not free agents in making the contract.

"Judge Wilbur: They were forced to it by the termination of the leases?

"Mr. Neblett: Yes, your Honor, they were forced into that position by the termination of the leases and order of the bankruptcy court.

"Judge Wilbur: You may proceed with your argument."

such result was authorized and contemplated by the Bankruptcy Act.

The allegation of the petition with reference to the fixing of the referee's fee is presented in two aspects: First, it is alleged as an overt act in connection with the charge of conspiracy in procuring the adjudication of bankruptcy. It is clear that an agreement of the referee to accept half the fee allowed him by law for his services in connection with the bankruptcy would have no bearing upon the question of whether or not the adjudication of bankruptcy was procured by fraud. The other aspect of the question is as to the validity of the order of the referee confirming the sale of the property of the bankrupt. Appellants' claim is that if the bid had been honest the referee would have been entitled to a fee of $154,443.88, that the referee was interested in his decision confirming the sale by the fact that if the sale was not confirmed together with the agreement in the ·bid concerning his fee, he would not have received any fee. Because of his interest in the fees to be derived by him from the proceeds of the sale it is claimed that he was so far interested in the order he made as to make his judicial action in approving the sale void.

It is sufficient answer to this contention to say that the order of the referee confirming the sale and fixing his fee[4] was confirmed by the District Court, and we are concerned, not with the action of the referee, but with the action of the court.

The allegations of the appellants of a pooling agreement between the referees for the division of fees is evidently made for the purpose of showing the interest of Referee Moss in the order confirming the sale which was made by him, but as we have said, the action of the referee was approved by the court and we are concerned only with the action of the latter.

With reference to the contention that inasmuch as the government had not been paid income tax amounting to approximately a million dollars at the time of the order closing the bankruptcy, the court still had jurisdiction to reopen the orders attacked by appellants, it is sufficient to say that the closing order of September 18, 1935, 'made no such reservation although the order of sale of November 22, 1934 of the assets of the bankrupt contained such provision.[5] The sale was consummated, the tax liability assumed by the purchaser, the assets of the bankrupt distributed, and the consent of the government to the sale, were all effectuated before the order of closure, which order did not reserve jurisdiction for any purpose.

We will now consider the appeal from the order denying the application of appellants for leave to file an amended petition. The refusal of the court to permit the amendment must be sustained ·unless there was an abuse of discretion. In considering that question the court had a right to and was bound to consider the nature of the amended petition and the circumstances under which it was presented, including its relationship to the original petition.

One of the considerations presenting itself to the court for determination is the fact that a creditor ordinarily has no right to attack an adjudication of bankruptcy made in a voluntary proceeding. This court so held in the case of In re A. C. Wagy & Co., Inc., 22 F.(2d) 9, 11, decided in 1927. The opinion written by Judge Gilbert concurred in by Judges Rud-

---

[4] The offer to purchase contained an agreement to pay all claims and all court expenses, including all or such part of the fee of the referee fixed by the court as did not exceed $75,000, and called for a 100 per cent. dividend on all claims, most of which were payable to the purchaser. The order of Referee Moss accepting this offer and confirming the sale also directed the payment of the 100 per cent. dividend. This order directed distribution of the assets in such fashion that nothing remained with which to pay the referee other than the purchaser's agreement to pay $75,000. Referee Moss had already entered an order fixing the fee of the referee at $75,000. In this order it was provided that the fees were fixed subject to the confirmation of the sale of the assets. Thus the order confirming the sale and accepting the offer to pay referees' fees up to $75,000 and the distribution of all the balance of the estate effectively fixed the fee of the referee. He could not get more or be allowed less. 11 U.S.C.A. §§ 68, 112.

[5] "It is further ordered that this court retain jurisdiction of the above entitled proceeding for the purpose of assuming the performance of the obligations of National Theatres Corporation under said offer and as imposed by paragraph 7 of this order."

kin and Dietrich, said: "In the second place, it is a fact decisive of the present appeals that a creditor has in no case a right to maintain a petition to vacate an adjudication of bankruptcy made in a voluntary proceeding," citing, In re Ives (C. C.A.) 113 F. 911; In re Pennington & Co. (D.C.) 228 F. 388; In re United Grocery Co. (D.C.) 239 F. 1016; In re Ann Arbor Machinery Co. (C.C.A.) 274 F. 24. This case was recently cited by the Supreme Court with approval in Royal Indemnity Co. et al. v. American Bond & Mtg. Co., 289 U.S. 165, 167, 53 S.Ct. 551, 77 L.Ed. 1100. There the directors of the bankrupt had authorized the filing of a petition in voluntary bankruptcy and the creditors sought to have the adjudication vacated on the ground that the directors had no authority to make such an application. The Supreme Court there stated: "Even if action of directors authorizing the filing of a voluntary petition, or admitting inability of the corporation to pay its debts and its willingness on that ground to be adjudged a bankrupt, thus creating an act of bankruptcy under section 3a(6) § 21 of the act [11 U.S.C.A. § 21(a) (6)] were in excess of the authority conferred, or otherwise invalid, creditors could not for that reason attack the consequent adjudication." (289 U.S. 165, 171, 53 S.Ct. 551, 554, 77 L.Ed. 1100).

In the case at bar the power of the directors to pass the resolution in bankruptcy is not attacked, but it is conceded. The appellants merely attack the motive of the directors in passing such a resolution. It would seem clear upon the principle announced by the Supreme Court in Royal Indemnity Co. v. American Bond & Mtg., supra, that creditors have no standing as such to attack the voluntary adjudication of bankruptcy in the case at bar, and that the adjudication must stand.

The appellants have not returned and do not offer to return the moneys and property of the bankrupt which they acquired by reason of or in connection with the bankruptcy. We must assume that since their leases have been disaffirmed by the trustees in bankruptcy they have been in possession of the leased premises owned by them for the entire period during which they demand that they be paid the monthly rental reserved in their respective leases. Appellant Tally, although he has parted with his claim against the bankrupt, and is no longer even a creditor, asks for relief which involves a rescission of his assignment to National Theatres Corporation. He has not restored to it the consideration paid to him for the assignment nor offered to do so. Such payment or offer is essential to a rescission.

Appellants rely upon the principles which have been developed in courts of equity to deprive parties of the fruits of a fraudulent judgment or decree. They claim that such principles are applicable in a bankruptcy court which in the main is controlled by the principles of equity. Continental Ill. Nat. Bk. & Trust Co. v. Chicago, Rock Island & Pac. Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; In re Concentrated Products Corp. (C.C.A.) 38 F.(2d) 745; Harris v. M. F. Shafer & Co. (C.C.A.) 10 F.(2d) 351; In re Chicago Reed & Furniture Co. (C.C.A.) 7 F.(2d) 885; Bardes v. First Nat. Bank, 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 230, 93 A.L.R. 195. One of these principles, which is applied by a court of equity in entertaining and acting upon a bill attacking a judgment for extrinsic fraud, is that the complainant must show a meritorious defense to the action in which by reason of extrinsic fraud he has not been able to properly present his defense. This rule was recently stated in Moffett v. Robbins, 81 F.(2d) 431, 435, supra, where the Circuit Court of Appeals for the Tenth Circuit, said: "But such relief will be granted only upon fraud extrinsic to the matters tried and determined by the other court and which caused the court to render a wrong judgment, such as the successful party through fraud or deception preventing the unsuccessful from presenting his case, or from attending the trial, or where his attorney was induced to betray his client's interest, or other chicanery of that kind. The submission of perjured testimony or a fraudulent instrument on which the judgment rests is not enough, because a matter of that kind is necessarily intrinsic the proceedings. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Luikart v. Farmers' Lumber Co. (C.C.A.) 38 F.(2d) 588. In order to come within the rule, it must appear by clear allegations of fact that the party asserting it had a valid defense to the cause of action on which the judgment was rendered; that he was prevented by extrinsic fraud, accident, mistake, concealment, or other chicanery from presenting such defense, and that he had not been negligent in availing himself of it.

Knox County v. Harshman, 133 U.S. 152, 10 S.Ct. 257, 33 L.Ed. 586; Whitcomb v. Shultz (C.C.A.) 223 F. 268; Jenner v. Murray (C.C.A.) 32 F.(2d) 625; Riverside Oil & Refining Co. v. Dudley (C.C. A.) 33 F.(2d) 749; Continental Nat. Bank v. Holland Banking Co. (C.C.A.) 66 F. (2d) 823; Wheiles v. Ætna Life Ins. Co. (C.C.A.) 68 F.(2d) 99."

■ Did the appellants have a valid defense to the judgment which they attacked, namely, the adjudication in bankruptcy? It is clear that they had no such defense because, as is now admitted by the appellants, the bankruptcy follows as a matter of course upon the voluntary act of the alleged bankrupt. Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113.

As to the circumstances under which the application for leave to file the amended petition was made, the court had a right to consider that the original petition was based upon the allegations that there was extrinsic fraud in concealing certain matters above stated from the judges who rendered decisions during the course of the bankruptcy proceeding, while the amended petition was based upon the diametrically opposite contention that the judge or judges *knew* the above-stated facts and with such knowledge participated in the fraudulent conspiracy. The only basis for this change of front by appellants is the claim that additional facts had been discovered while the first petition was pending and before the court ruled thereon. The fact that the appellants had formally, emphatically and unqualifiedly withdrawn all allegations or implications reflecting upon the integrity of the judges and Referee McNabb who participated in the bankruptcy matter, and that these allegations were subsequently renewed with elaboration in the proposed amended petition, were matters properly to be considered by the trial judge in exercising his discretion. He also was required to consider that each of the alleged conspirators except the Chase National Bank, which had not been served with subpœna either in their answers to the original petition or in affidavits filed in opposition to the application for vacation of the order or in opposition to the proposed amended petition, had expressly denied the general allegation of fraud and conspiracy and stated the facts concerning the charges in detail and that although the allegations of fraud were renewed after they had been expressly withdrawn, there was no indication of the nature of the discoveries which resulted in the change of front other than the general allegation that such discovery had been made, and that the appellants were informed and believed the statements they make in the petition are true. The appellants should have stated specifically what new facts had been discovered. The court also had a right to consider the fact that it had already held that it had no jurisdiction to consider the petition and that its order of dismissal was an appealable order. It also had the right to consider the fact that the charges of fraud and misconduct in the original petition expressly withdrawn were only renewed after its holding that the withdrawal of such charges deprived the court of jurisdiction which it might have exercised if the charge of fraud had not been withdrawn. The court also had a right to consider the basis and foundation of the charges so renewed. The whole matter had been submitted to the court after seven days' argument on the original petition. The entire record in the bankruptcy proceeding was spread before the court and the merits of the application were argued and fully presented. The only thing lacking was the taking of testimony upon the issues of fact which were largely rendered immaterial by the withdrawal of the charges of fraud. With this background of fact, we turn to a more detailed consideration of the allegations of fraud in the proposed amended petition.

It is alleged that the judge knew that the resignation of his son-in-law as director and secretary of the bankrupt was "merely colorful," and that as a matter of fact the son-in-law still retained his position.

■ This allegation was denied in an affidavit filed by the judge and also in one filed by his son-in-law. The allegation of the petition is on information and belief and no information is alleged which justifies the belief. Even if the allegation were true it would not render the order of adjudication void as such relationship would not disqualify the Judge. 28 U.S.C.A. § 24; Spencer v. Lapsley, 20 How. (61 U. S.) 264, 266, 15 L.Ed. 902.

It is alleged that when the Referee McNabb approved the claim of Wesco for $11,331,052.80 and the claim of Fox Film for $2,708,858.97 he did so "knowing full

well the fictitious character of the $8,000,000 dividend and certain other items which are included in these claims, and in face of the fact that he had signed a stipulation as United States District Attorney, on August 21, 1931, (No. S 10 C), and again, on November 16, 1932, (No. Y 38 H), for a consent decree against Fox West Coast Theatres, Wesco and Fox Film, and others, in which it was stipulated and decreed that Fox Film, Wesco and the bankrupt were one and the same. Nevertheless, with full knowledge of these facts, he approved these claims and made it possible for them to be used as approximately 94% of a fictitious cash bid in the purchase of the bankrupt's property at private sale." This matter which we have just quoted was stricken from the amended petition after leave to file the same had been denied. It was further alleged on information and belief that after the appointment of McNabb as referee, the consent decrees above referred to were violated throughout the bankruptcy administration by the trustees, the bankrupt, its subsidiary, and its parent corporations "with the knowledge and consent of McNabb acting as referee." This latter phrase was also stricken out by the court.

In reply to this allegation McNabb filed an additional affidavit stating at considerable length the facts with relation to the above mentioned consent decrees. He states in effect that the indictment against the West Coast Theatres, Inc., and others, was not prosecuted by him but by the Attorney General of the United States and his Special Assistant; that the facts upon which the indictment was returned to the federal grand jury were not presented by him but by a Special Assistant to the Attorney General of the United States; that the indictment was filed April 19, 1929; that on August 21, 1930, the indictment was dismissed by the United States District Judge; and that the United States Government was represented at the hearing by two Special Assistants to the Attorney General of the United States. The affiant states that to the best of his knowledge and belief he had nothing to do with the dismissal of the action; that upon the day of the dismissal of the action a proceeding for an injunction also based upon a violation of the Sherman Anti-Trust law was instituted and on the same day a consent decree was entered by the court; that this decree was not prepared by affiant or by his deputies but by the Special Assistants to the Attorney General, although the petition for the writ was signed on behalf of affiant by his Assistant United States Attorney; that he had no control of the proceeding, but acted solely under the control and direction of the Attorney General of the United States. McNabb further alleged that the stipulation for the consent decree signed by him November 16, 1932 was prepared by the Attorney General's office and approved by the attorneys for the defendants in New York City, and that Thos. D. Thatcher, acting Attorney General of the United States and several of his assistants, signed the petition; furthermore, the referee denied any knowledge of or participation in any conspiracy, and denied that he knew that any of the claims allowed by him were fictitious. The final decrees referred to are attached to the affidavit of McNabb. There is no provision in the decrees holding that the Fox Film, the Wesco and the Fox West Coast Theatres, bankrupt, "were one and the same." The bankrupt and the Fox Film Corporation were represented by attorneys in the proceedings and Wesco was not a party to the actions. There is no finding and no allegation in the complaint in these equity proceedings that these three corporations were one and the same.[6] Even if there were such a finding and decree and stipulation, it would not be true. They were three separate corporations and in a bankruptcy proceeding it was necessary that they be treated as separate and distinct corporations.

We have recently had occasion to consider the question as to whether or not the doctrine of alter ego can be applied to a bankruptcy proceeding. In Exchange Nat'l Bank v. Meikle, 61 F.(2d) 176, 179, we were presented with a novel situation wherein one individual owned all the stock of a number of very large and active corporations. In that case we said: "It is not difficult to see Herrick [the sole stockholder] as the prime mover of all the various companies, but the rule is well established that a corporation exists as an entity, and that courts of law will not go beyond the fact of corporate existence in

---

6 The decree states that: "For the purpose of this decree in case any defendant is owned directly or indirectly by another defendant, the two defendants shall, so long as such relationship continues, be deemed one defendant."

order to examine the real ownership of a corporation." See, also, concerning the same. group of corporations, Meikle v. Export, etc. (C.C.A.) 67 F.(2d) 301; Meikle v. Drain (C.C.A.) 69 F.(2d) 290, 291. See also our decision in Ramish v. Laugharn (Re Chas. Behr), 86 F.(2d) 686, decided November 16, 1936.

The rule that corporate entity must be recognized in spite of stock ownership has recently been stated by a number of Circuit Courts of Appeals. In Greenbaum v. Lehrenkrauss Corp., 73 F.(2d) 285, 286, the Circuit Court of Appeals of the Second Circuit said:

"Although Lehrenkrauss Corporation owns a very large proportion of the stock of the title company and the latter is an important factor in what the appellees call 'the entire Lehrenkrauss organization,' there is no suggestion in the record that the two corporations have not always transacted their business as separate and distinct corporate entities. Control through ownership of shares does not fuse the corporations so that contractual obligations of the one can be enforced against the other. See Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.(2d) 265, 267 (C.C.A.2); Martin v. Development Co. of America, 240 F. 42, 45 (C. C.A.9); Pittsburgh & Buffalo Co. v. Duncan, 232 F. 584, 587 (C.C.A.6). Nor, in an action to collect a debt owed by the 'subsidiary,' would the receivers of the 'parent' be entitled to intervene. First Nat. Bank v. Walton, 146 Wash. 367, 262 P. 984. Under these circumstances we can see absolutely no legal justification for enjoining the prosecution of suits against one of the corporations on a bill for receivership filed against the other. * * *

"The only ground on which the order could be supported would be a finding that the title company and the receivership defendant are in substance one corporation so that the fiction of separate corporate entities may be disregarded. See Trustees System of Pennsylvania v. Payne, 65 F. (2d) 103 (C.C.A.3); Central Republic Bank & Trust Co. v. Caldwell, 58 F.(2d) 721, 735 (C.C.A.8); Hamilton Ridge Lumber Sales Corp. v. Wilson, 25 F.(2d) 592 (C.C.A.4); In re Muncie Pulp Co., 139 F. 546 (C.C.A.2); compare In re Routt Lumber Co., 59 F.(2d) 29 (C.C.A.9). But on this record such a finding could not be made. On the contrary, the plain implication from the moving papers and the affidavits submitted in opposition is that the title company is a distinct corporation, having its own assets, its own creditors, and its own obligations under the insurance laws of the state of New York."

In Commerce Trust Co. v. Woodbury, 77 F.(2d) 478, 487, the Circuit Court of Appeals of the Eighth Circuit said: "Few questions of law are better settled than that a corporation is ordinarily a wholly separate entity from its stockholders, whether they be one or more. In re Collins (C.C.A.) 75 F.(2d) 62; Wilson v. Crooks (D.C.) 52 F.(2d) 692; Majestic Co. v. Orpheum Circuit, Inc. (C.C.A.) 21 F.(2d) 720; Owl Fumigating Corp. v. California Cyanide Co. (D.C.) 24 F.(2d) 718, loc.cit. 719; Pullman's Palace-Car Co. v. Missouri Pacific Ry. Co., 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499. Likewise, we think it must be conceded that neither ownership of all of the stock of one corporation by another, nor the identity of officers in one with officers in another, creates a merger of the two corporations into a single entity, or makes one either the principal or agent of the other. Owl Fumigating Corporation v. Cyanide Co. (D. C.) 24 F.(2d) 718; Corsicana Nat. Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L. Ed. 141; Marsch v. Railroad, 230 Mass. 483, 120 N.E. 120; Richmond, etc., Co. v. Richmond, etc., Ry. Co. (C.C.A.) 68 F. 105, 34 L.R.A. 625. But notwithstanding such situation and such intimacy of relation, the corporation will be regarded as a legal entity, as a general rule, and the courts will ignore the fiction of corporate entity only with caution, and when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud."

In Trustees System of Penn. v. Payne, 65 F.(2d) 103, 107, the Circuit Court of Appeals for the Third Circuit held that a receivership would be granted in equity over a solvent subsidiary as ancillary to a receivership in equity. This was recognized as an extension of the doctrine as theretofore applied by courts of equity. The court said: "It is recognized in principal that the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation. Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct.

553, 62 L.Ed. 1229; In re Rieger, Kapner & Altmark (D.C.) 157 F. 609; Brown v. Pennsylvania Canal Co. (C.C.A.) 235 F. 669; Brown v. Pennsylvania R. Co. (C. C.A.) 250 F. 513; Industrial Research Corp. v. General Motors Corp. (D.C.) 29 F.(2d) 623, 625; Central Republic Bank & Trust Co. v. Caldwell (C.C.A.) 58 F. (2d) 721. Through long practice courts have not hesitated to disregard the doctrine of corporate entities when the facts justify it. Although we know of no instance in which it has been done in matters of receivership, we cannot see why the same power does not exist in a court or why the law does not impose upon a court the same duty in a receivership matter when, as here, the facts are substantial enough to justify, indeed to compel, a finding that the five corporations were so identified with the parent corporation as to be a part of it. Being of opinion that the law makes no exception of receiverships, we tear asunder the legal maze of corporate fiction in which they have enveloped themselves and, observing that the six corporations were not merely related by stock ownership but, like wheels in a machine, were so closely meshed that all functioned together, we find from the bills that in legal effect they were one, a finding in consonance with the casual statement of the attorney for the parent corporation at the hearing that 'the whole thing from Alabama to Pennsylvania is really one company.' "

However, the Circuit Court of Appeals for the Fifth Circuit in administering the affairs of one of the subsidiary corporations referred to by the Circuit Court of Appeals for the Third Circuit, supra, in an opinion rendered December 11, 1936 [Simons et al. v. Chambless, as Trustee of Trusco Co. of Reading, 86 F.(2d) 569], held that the creditors of the parent corporation who had applied for receivership of the solvent subsidiaries did not thereby become entitled to be considered creditors of the subsidiary and that the creditors of the subsidiary were entitled to be paid from its assets before the balance was subjected to the claims of the parent corporation. We cite this case to emphasize the fact that the corporate entities cannot be properly disregarded in an equity receivership in the administration of the funds of the several corporations. This distinction is more necessary and vital in a bankruptcy court where, in the bankruptcy of the parent corporation, the stock it owns in its sub-

sidiaries can be sold for the benefit of its creditors without interfering with the management and control of the subsidiaries during the process of liquidation.

It is true that where a holding company had been organized for the express purpose of avoiding the liability of stockholders in a national bank the Circuit Court of Appeals for the Eighth Circuit in Metropolitan Holding Co. v. Snyder, 79 F.(2d) 263, 266, 103 A.L.R. 912, held that the stockholders of the holding company were liable for their prorata liability in the national bank disregarding the corporate entity of the holding company. We cite this case as one going to the extreme limit in disregarding corporate entity. A quotation from that opinion will show how far short of that rule the appellants herein have fallen in mere general allegations of corporate stockholding relationship. We quote as follows:

"To deprive the creditors of a national bank of their statutory protection by such a method is wrong and the courts will not countenance the interposition of a mere corporate shadow to conceal who are the actual and beneficial owners of bank shares. To permit individuals to circumvent the contingent liability under this statute by simply organizing a corporation for the purpose of holding shares would set up a device against which the statute would ever afterwards be ineffective.

"Judge Sanborn for this court in 1905 in the case of United States v. Milwaukee Refrigerator Transit Co. (C.C.) 142 F. 247, 255, stated that, 'when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' There has been a growing tendency upon the part of the courts to disregard corporate entity and to treat the stockholders thereof as an association of individuals when the interests of justice are to be served. Edward Finch Co. v. Robie (C. C.A.) 12 F.(2d) 360; Page v. Arkansas Natural Gas Corporation (C.C.A.) 53 F. (2d) 27; Callas v. Independent Taxi Owners' Ass'n, 62 App.D.C. 212, 66 F.(2d) 192; Laurent v. Anderson (C.C.A.) 70 F.(2d) 819; J. J. McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590; Trustees System Co. of Pennsylvania v. Payne (C.C.A.) 65 F.(2d) 103; Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490–501, 38

S.Ct. 553, 62 L.Ed. 1229; Ohio Valley Nat. Bank v. Hulitt, 204 U.S. 162, 168, 27 S.Ct. 179, 51 L.Ed. 423; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458."

We conclude that the allegations in appellants' proffered amended petition fall far short of establishing that defendants in the consent decree were one or that their business could be treated as a unit. The allegations of corporate unity are but a legal conclusion.

In the proposed amended petition other allegations relate to the qualification of McNabb as referee. Appellants' contention is that as the order appointing McNabb referee in bankruptcy for the county of Los Angeles was made January 19, 1933, which was at a time when he was holding office as United States Attorney, under section 35 of the Bankruptcy Act (11 U.S.C.A. § 63) he was not eligible to be appointed referee and, that the purported appointment was ineffective and therefore that all his judicial acts including the order of closure were void.

It is sufficient answer to this contention to say that the order referring the case to McNabb as referee was made after he had resigned as United States Attorney and was in effect an appointment as of that date. Consequently, McNabb was a qualified referee. Even if McNabb had not been legally appointed he would have been a de facto referee. Waite v. Santa Cruz, 184 U.S. 302, 22 S.Ct. 327, 46 L.Ed. 552.

Certain other allegations were made concerning the trial judge and the referee in bankruptcy and the participation of the judge's son-in-law in the matter, all upon information and belief. These allegations were stricken out as scandalous in view of the admission of counsel upon the hearing of the first petition. We feel that they should not be elaborately quoted and stated in our opinion in view of the order of the trial court striking them out. They are all based upon information and belief and in effect charged that the son-in-law of the judge was the go-between himself and the conspirators, that he acted with knowledge of the fictitious character of the claims asserted against the bankrupt, and with full knowledge of the Sherman Anti-Trust prosecutions and of McNabb's participation therein, and of all fraudulent transfers made just prior to the bankruptcy and that all the matters were done in collusion with the bankrupt Wesco, Fox

Film, and Chase National Bank of the City of New York; that the arrangement for the appointment of McNabb was the result of the request of the so-called conspirators and that the petition in voluntary bankruptcy was brought before the judge in accordance with prearranged plan. It was alleged that the judge had conspired with four corporations mentioned to evade the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note. There is a general allegation that is stricken out that "these things and more were all done by West Coast Theatres, Wesco, Fox Film, and Chase National Bank of the City of New York, their officers, directors, agents and attorneys in collusion and conspiracy with" the judge and the referee.

The allegations referring to the alleged violation of the Sherman Anti-Trust Act and of the decree of the court enjoining the parties from such violation is a most serious charge, particularly when directed toward judicial officers of the government whose duty it is to consider and determine actions brought against private persons for such misconduct. These charges were emphatically denied by affidavit as against a mere allegation upon information and belief. It is sufficient, however, in passing upon the matter now before us to say that violation of the Sherman Anti-Trust Act is entirely foreign to the rights of the appellants to recover rent from the bankrupt. The matter was properly stricken out.

Without further elaboration of the allegations of the proposed amended petition, or discussion of the facts set forth in the affidavits and contained in the several thousand pages of the record which by reference was made a part of the petition, we summarize some of the reasons which justified the denial of the application of the appellants for leave to file their proposed amended petition:

First, there was no allegation of extrinsic fraud. Consequently, there was no jurisdiction in the bankruptcy court to vacate its order of adjudication even if extrinsic fraud would justify such action.

Second, the order of adjudication of bankruptcy followed as a matter of course upon the application therefor by the bankrupt. Consequently, no ground is alleged for the vacation of the order.

Third, although the appellants claim to be creditors of the bankrupt, creditors have no standing in a bankruptcy court to at-

tach an order of adjudication of bankruptcy upon the voluntary petition of the bankrupt.

Fourth, the appellants are not even creditors of the bankrupt because they have relinquished the obligations due them, appellant Tally to the National Theatres Corporation, one of the appellees, and appellant Corbar Corporation to the Far West Theatre Corporation.

Fifth, the appellants are in no position in this action to ask for a rescission of their assignment of their obligations to the National Theatres Corporation because they have not offered to restore to the National Theatres Corporation the consideration received from it for the assignment.

Sixth, even if the petitioners were in a position to attack the order of adjudication upon the ground of extrinsic fraud it is essential that they should allege and prove that but for such fraud they could have prevented the decision of the court which they attack. The decision principally attacked is the order of adjudication which appellants now concede necessarily followed upon the filing of petition.

· Seventh, in order to invoke the extraordinary powers of a court of equity to vacate or ignore an order because procured by extrinsic fraud, the party making the attack must show injury by reason of the order. No such injury is shown.

Eighth, no adequate reason is alleged or shown why the appellants reversed their position from a charge of concealment of material facts in the original amended petition to a charge of knowledge of these same facts and of active participation in the fraud by the officers of the court alleged in the proposed amended petition.

Ninth, the allegations made in the original and in the proposed amended complaint were based upon information and belief and the source of the information was not disclosed, whereas, the answers and affidavits in reply were based upon knowledge.

Tenth, the application of the appellants to reopen the bankruptcy proceedings and set aside the adjudication would have involved a new adjudication upon the same petition and an attempt to recover the assets which had been distributed by the bankruptcy court to be again distributed by it, all for the purpose of enabling the appellants to recover rents for the period intervening between the first and the proposed adjudication in bankruptcy plus such additional amount as they might recover by way of claims in bankruptcy, although the appellants had profited by the distribution of the property of the bankrupt and have failed to restore or offer to restore the property they had thus received. In other words, they have taken full advantage of the bankruptcy proceeding, and while retaining that advantage they desire to set aside the entire proceeding. This is inequitable.

Eleventh, the judge adjudicating the Fox West Coast Theatres bankrupt was not disqualified by reason of his relationship.

It follows that there was no abuse of discretion in the denial of the application for leave to file the proposed amended petition.

We have not failed to observe the fact that the serious charges against the officers of the District Court are made and presented by an attorney. We feel that this is not the time or place to discuss the ethical questions involved further than to state that it is entirely clear that such allegations ought not to be made upon a mere avowal of information and belief. The information upon which the belief was formed and the newly discovered evidence upon which appellants' change of front was based should have been fully presented to the court either in the proposed amended petition itself or in affidavits in reply to those filed by the respondents which denied the charges categorically and in detail. There is nothing in the record before us that indicates that the appellants have any information in addition to that which is contained in the record before us and was a part of the files in the bankruptcy case open to all, other than such facts as are alleged with relation to the criminal prosecution and civil cases involving the Sherman Anti-Trust law, and as to these Referee McNabb states in his affidavit that his records showing his correspondence with the Attorney General in reference thereto were public records in the office of the District Attorney accessible to the public.

For the reasons stated the action of the trial court in refusing to file the proposed amended petition was correct.

The order refusing leave to file the proposed amended petition is affirmed.

The order dismissing the first petition as amended is affirmed.